ROSCOE C. WEBB, JR., ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Webb v. Commissioner
Docket Nos. 11415-85, 18029-86, 27578-86, 43921-86, 47752-86, 14440-87, 36291-85, 25683-86, 40464-86, 46308-86, 48498-86, 15064-87
United States Tax Court
T.C. Memo 1990-556; 1990 Tax Ct. Memo LEXIS 628; 60 T.C.M. (CCH) 1085; T.C.M. (RIA) 90556; October 25, 1990, Filed *628 Decisions will be entered under Rule 155. Frederick M. Mintz and Jay L. Zeiger for the petitioners. Kevin M. Flynn, Sharon Katz-Pearlman, Curt Rubin, and Jeannette Schmelzle, for the respondent. DAWSON Judge. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSONJudge: These consolidated cases were assigned for trial or other disposition *631 to Special Trial Judge James M. Gussis pursuant to section 7443A(b) of the Internal Revenue Code and Rule 180 et seq. [2] This Court agrees with and adopts the opinion of the Special Trial Judge which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE GUSSIS, Special Trial Judge: Respondent determined the following Federal income tax deficiencies, additions to tax and increased interest:
Increased
Interest
Docket No.
Petitioners
Year
Deficiency
§ 6621(c)
11415-85
Roscoe C.
1981
$ 69,363.00
-
Webb, Jr.
36291-85
Frank Dietrich
1981
14,562.08
-
18029-86
Nicholas L. Arky
1981
24,394.00
applicable
1982
12,881.00
applicable
Additions to Tax
Docket No.
Petitioners § 6653(a)(1)
§ 6653(a)(2)
§ 6659
§ 6661
11415-85
Roscoe C.
-
-
-
-
Webb, Jr.
36291-85
Frank Dietrich
-
-
-
-
18029-86
Nicholas L. Arky
$ 1,219.70
*
$ 7,318.20
- 644.05
** 3,752.70
$ 37.20
*632 Additions to Tax
Docket No.
Petitioners
§ 6653(a)(1)
§ 6653(a)2)
§ 6659
§ 6661
25683-86
Herman David &
-
-
-
-
Sylvia David
27578-86
Lester H. 1,000.50
*
6,002.54 applicable
Strickler 1,049.25
** 6,295.50
applicable
E. Grace Strickler Increased Interest Docket No.
Petitioners Year
Deficiency § 6621(c) 40464-86
George Tsakonas
1981
15,614.75
applicable
& Ernestine
Tsakonas
43921-86
Fred J. Sherman
1980
24,863.00
applicable
& Leonora Sherman
46308-86
Michael Sirkus
1980
28,040.00
applicable
1981
27,285.00
applicable
1982
30,859.00
applicable
47752-86
Estate of Aaron
1981
22,916.00
applicable
Bassin, Deceased,
Ruth Bassin,
Personal
Representative,
& Ruth Bassin
48498-86
William R.
1980
16,257.00
applicable
Parient, Jr., &
Jane M. Parient
14440-87
Eugene & Leora
1982
37,282.00
applicable
Pitts
15064-87
Quaiser Bakht &
1980
21,879.22
applicable
Cresanta Bakht
*633 Additions to Tax
Docket No.
Petitioners
§ 6653(a)(1)
§ 6653(a)(2)
§ 6659
§ 6661
40464-86
George Tsakonas
-
-
4,684.43
-
& Ernestine
Tsakonas
43921-86
Fred J. Sherman
-
-
-
-
& Leonora Sherman
46308-86
Michael Sirkus
-
-
-
-
-
-
8,186.00
-
-
-
9,258.00
applicable
47752-86
Estate of Aaron
-
-
6,875.00
-
Bassin, Deceased,
Ruth Bassin,
Personal
Representative,
& Ruth Bassin
48498-86
William R.
-
-
-
-
Parient, Jr., &
Jane M. Parient
14440-87
Eugene & Leora
-
-
5,900.00
-
Pitts
15064-87
Quaiser Bakht &
-
-
-
Cresanta Bakht
Respondent, by way of amended answer, asserted the following: docket No. 11415-85, increased interest and additions to tax for the year 1981 under sections 6621(c), 6653(a)(1) and (2) and 6659; docket No. 36291-85, increased interest and additions to tax for the year 1981 under sections 6621(c), 6653(a)(1) and (2) and 6659; docket No. 25683-86, increased interest and additions to tax for the year 1982 under sections 6621(c), 6653(a)(1) *634 and (2), 6659, and section 6661; docket No. 40464-86, additions to tax for 1981 under section 6653(a)(1) and (2); docket No. 48498-86, additions to tax for 1980 under section 6653(a); docket No. 14440-87, additions to tax for 1982 under sections 6653(a)(1) and (2) and 6661. Respondent has now conceded that section 6659 is inapplicable to these cases. Respondent has also moved for the imposition of damages in each of these cases under the provisions of section 6673. These cases were selected by the parties as test cases for the resolution of certain issues common to a large number of cases designated as the Petro-Tech group. Petitioners herein were investors in six of the limited partnerships which were involved in the Petro-Tech group, namely: Limited Partnerships
Petitioners
Docket Nos.
Great Salt Lake
Quaiser Bakht &
15064-87
Drilling
Cresanta Bakht
Associates
Fred J. Sherman &
43921-86
Leonora Sherman
Rocky Mountain
Michael Sirkus
46308-86
Drilling
William R. Parient, Jr.,
48498-86
Associates
& Jane M. Parient
Far West Drilling
George Tsakonas &
40464-86
Associates
Ernestine Tsakonas
Roscoe C. Webb, Jr.
11415-85
Far West Drilling
Lester H. Strickler
27578-86
Associates II
& E. Grace Strickler
Eugene & Leora
14440-87
Pitts
Midcontinent
Frank Dietrich
36291-85
Drilling
Estate of Aaron Bassin,
47752-86
Associates
Deceased, Ruth Bassin,
Personal Representative,
& Ruth Bassin
Midcontinent
Herman David & Sylvia
25683-86
Drilling
David
Associates II
Nicholas L. Arky
18029-86
*635 The issues in these consolidated cases are (1) whether the activities of each of the limited partnerships were entered into for profit within the meaning of section 183(a); (2) whether sublicense fees deducted by each of the limited partnerships were paid or incurred in connection with a trade or business within the meaning of sections 162 and 1253(d)(2); (3) whether deductions for the portion of the sublicense fees attributable to the notes which are payable to Mitchell Petroleum Technology Corporation should be disallowed; (4) whether the portion of the sublicense fees attributable to the recourse notes which were payable to Mitchell Petroleum Technology Corporation and were purportedly assumed by the individual partners should be included in each individual partner's at-risk basis pursuant to section 465; (5) whether the losses claimed by the individual partners are in excess of the amounts at risk in their respective limited partnerships pursuant to the provisions of section 465, or the basis in such partnerships pursuant to section 704(d); (6) whether the additions to tax under section 6653(a)(1) and (2) are applicable with respect to petitioners here involved; (7) whether petitioners *636 are subject to the additions to tax pursuant to section 6661 for substantial understatement of tax liability; (8) whether petitioners are subject to the increased interest provisions of section 6621(c) with respect to substantial underpayments attributable to tax-motivated transactions; and (9) whether petitioners are liable for a penalty pursuant to section 6673 because the proceedings herein were purportedly instituted primarily for delay or were frivolous in nature. FINDINGS OF FACT Some of the facts have been stipulated and they are herein incorporated by this reference. Quaiser Bakht and Cresanta Bakht were residents of Wainscott, New York, at the time their petition herein was filed. Dr. Bakht has been a physician since 1955. Quaiser and Cresanta Bakht filed a timely joint Federal income tax return for the year 1980 in which they claimed a loss in the amount of $ 49,502 with respect to their investment in Great Salt Lake Drilling Associates which was disallowed by respondent. Fred J. Sherman and Leonora Sherman were residents of Newport, California at the time their petition herein was filed. During the period at issue Mr. Sherman was in the export trading business *637 and was president and principal owner of Searock Trading Corporation. Fred J. Sherman and Leonora Sherman filed a timely joint Federal income tax return for the year 1980 in which they claimed a loss in the amount of $ 49,503 with respect to their investment in Great Salt Lake Drilling Associates which was disallowed by respondent. Michael Sirkus was a resident of New York, New York at the time his petition herein was filed. Mr. Sirkus is engaged in the wholesale seafood business. He filed timely Federal income tax returns for the years 1980, 1981, and 1982 in which he claimed losses in the respective amounts of $ 49,501, $ 53,075, and $ 59,639 with respect to his investment in Rocky Mountain Drilling Associates which respondent disallowed in full. William R. Parient, Jr., and Jane M. Parient were residents of Lincolnshire Woods, Illinois, at the time their petition herein was filed. Mr. Parient is engaged in the profession of financial planning. In or about 1980 he was an executive of Anixter Brothers, Inc., a worldwide distributor of electrical wire and cable and various products for the cable television industry. William R. Parient, Jr., and Jane M. Parient filed a timely *638 Federal income tax return for the year 1980 in which they claimed a loss of $ 49,502 with respect to their investment in Rocky Mountain Drilling Associates which was disallowed by respondent. George Tsakonas and Ernestine Tsakonas were residents of Staten Island, New York, at the time their petition herein was filed. Dr. Tsakonas has been a physician for some 25 years. George Tsakonas and Ernestine Tsakonas filed a timely joint Federal income tax return for the year 1981 in which they claimed a loss of $ 52,017 with respect to their investment in Far West Drilling Associates which was disallowed by respondent. Roscoe C. Webb, Jr., was a resident of Santa Monica, California, at the time his petition herein was filed. Dr. Webb has been a surgeon since the late 1950's. Dr. Webb filed a timely joint Federal return with his former wife for the taxable year 1981 in which they claimed a loss of $ 104,033 with respect to their investment in Far West Drilling Associates which was disallowed by respondent. Lester H. Strickler and E. Grace Strickler were residents of Los Gatos, California, at the time their petition herein was filed. They filed a timely joint Federal income tax return *639 for the years 1981 and 1982 in which they claimed losses in the respective amounts of $ 39,600 and $ 42,200 with respect to their investment in Far West Drilling Associates II which were disallowed by respondent. Eugene Pitts and Leora Pitts were residents of Waukegan, Illinois, at the time their petition herein was filed. Dr. Pitts, now retired, was a physician for many years. Eugene Pitts and Leora Pitts filed a joint Federal income tax return for the year 1982 in which they claimed a loss of $ 42,200 with respect to their investment in Far West Drilling Associates II which was disallowed by respondent. Frank Dietrich was a resident of Toledo, Ohio, at the time his petition herein was filed. He filed a timely Federal income tax return for the year 1981 in which he claimed a loss of $ 36,528.46 with respect to his investment in Midcontinent Drilling Associates which was disallowed by respondent. Aaron Bassin (now deceased) and Ruth Bassin were residents of Bethesda, Maryland, at the time their petition herein was filed. They filed a timely Federal income tax return for the year 1981 in which they claimed a loss of $ 37,104 with respect to their investment in Midcontinent *640 Drilling Associates which was disallowed by respondent. Herman David and Sylvia David were residents of Miami Beach, Florida, at the time their petition herein was filed. Mr. David has been engaged in the diamond business for many years. Herman David and Sylvia David filed a timely Federal income tax return for the year 1982 in which they claimed a loss of $ 64,451 with respect to their investment in Midcontinent Drilling Associates II which was disallowed by respondent. Nicholas L. Arky was a resident of Denver, Colorado, at the time his petition herein was filed. He filed a timely Federal income tax return for the years 1981 and 1982 in which he claimed losses in the respective amounts of $ 39,600 and $ 42,967 with respect to his investment in Midcontinent Drilling Associates II which were disallowed by respondent. Herman Finesod is sole stockholder of M&J Holding Company (M&J) which holds the stock in various corporations including Jackie Fine Arts, Hambrose Leasing, Hambrose Stamps, Worldco Services Group, Petro-Tech, Mitchell Energy and Mitchell Petroleum Technology Corporation. Herman Finesod is president of said corporations. None of these companies is active at the *641 present time except for certain continuing bookkeeping functions. James Haber, a certified public accountant, was secretary-treasurer of Mitchell Petroleum Technology Corporation. Great Salt Lake Drilling Associates (GSLDA), a limited partnership, was formed under the laws of the State of Utah on October 10, 1980, and limited partnership interests therein were offered for sale pursuant to a confidential private placement memorandum dated November 18, 1980. Rocky Mountain Drilling Associates (RMDA), a limited partnership, was formed under the laws of the State of Utah on November 7, 1980, and limited partnership interests therein were offered for sale pursuant to a confidential private placement memorandum dated November 18, 1980. Far West Drilling Associates (FWDA), a limited partnership, was formed under the laws of the State of Utah on December 4, 1980, and limited partnership interests therein were offered for sale pursuant to a confidential private placement memorandum dated May 11, 1981. Far West Drilling Associates II (FWDA II) a limited partnership, was formed under the laws of the State of Utah on November 2, 1981, and limited partnership interests therein were offered *642 for sale pursuant to a confidential private placement memorandum dated December 1, 1981. Midcontinent Drilling Associates (MCDA), a limited partnership, was formed under the laws of the State of Utah on December 4, 1980, and limited partnership interests therein were offered for sale pursuant to a confidential private placement memorandum dated January 31, 1981. Midcontinent Drilling Associates II (MCDA II), a limited partnership, was formed under the laws of the State of Utah on December 4, 1980, and limited partnership interests therein were offered for sale pursuant to a confidential private placement memorandum dated October 26, 1981. Each of the above limited partnerships had an individual and a corporate general partner. Quaiser Bakht is a physician. He learned about the GSLDA program from one Carmine Lopresti, a financial adviser. Dr. Bakht discussed the investment with his accountant and was told that the investment was risky, that it made sense on a long-term basis, and that it would entail losses in the short run. Dr. Bakht acquired his interest in GSLDA on December 17, 1980. He made a cash down payment of $ 12,500, executed two negotiable promissory notes, due March 1, 1981, and *643 March 1, 1982, respectively, each in the amount of $ 12,500, and a nonnegotiable note in the amount of $ 112,500 due January 15, 1993. The due date of the nonnegotiable note was subsequently extended from 1993 to 1999. Fred J. Sherman learned about GSLDA from his accountant. Mr. Sherman relied upon his accountant and his stepson, who was business manager of petitioner's trading corporation, in making the investment in GSLDA. Mr. Sherman acquired his interest in GSLDA in 1980. He made a cash down payment of $ 12,500, executed two promissory notes due March 1, 1981, and March 1, 1982, respectively, each in the amount of $ 12,500, and a nonnegotiable promissory note in the amount of $ 112,500 due January 15, 1993. Michael Sirkus learned about RMDA from his accountant. Previously, Mr. Sirkus had invested in securities involving oil and gas drilling. His investments in Transcontinental Oil and Petro-Lewis resulted in gains in 1980. He also invested in two limited partnerships, Normandy Square Associates and Southland Villas Associates. Mr. Sirkus acquired his interest in RMDA in 1980. He made a cash down payment of $ 12,500, executed two negotiable promissory notes due March 1, 1981, and *644 March 1, 1982, respectively, each in the amount of $ 12,500, and executed a nonnegotiable promissory note in the amount of $ 112,500 due January 15, 1993. William R. Parient, Jr., held a 50-percent partnership interest in a partnership known as 8220 Skokie Blvd. Building. The partnership acquired an interest in RMDA in December 1980, under the following terms: a cash down payment of $ 25,000, two negotiable promissory notes due March 1, 1981, and March 1, 1982, respectively, each in the amount of $ 25,000, and a negotiable promissory note in the amount of $ 225,000 due January 15, 1993. George Tsakonas acquired an interest in FWDA in 1981. Dr. Tsakonas made a cash down payment of $ 15,000, executed two negotiable promissory notes due March 1, 1982, and March 1, 1983, respectively, each in the amount of $ 15,000, and an open obligation to FWDA of $ 112,500 payable January 15, 1994. Roscoe C. Webb, Jr., a surgeon, learned about FWDA from his accountant. Dr. Webb acquired an interest in FWDA in 1981. He made a cash down payment of $ 30,000, executed two negotiable notes dated March 1, 1982, and 1983, respectively, each in the amount of $ 30,000. The balance of the purchase price, *645 $ 225,000, was represented by an open account obligation to FWDA due in 1994. Lester H. Strickler acquired an interest in FWDA II in 1981. He made a cash down payment of $ 10,000 and executed two promissory notes due March 1, 1982, and March 1, 1983, respectively, each in the amount of $ 10,000. The balance of the purported purchase price of $ 150,000 was represented by an open account obligation to FWDA II in the amount of $ 120,000, payable in 1994. Eugene Pitts acquired an interest in FWDA II in 1981 under the following terms: a cash down payment of $ 10,000, two negotiable promissory notes each in the amount of $ 10,000 due March 1, 1982, and March 1, 1983, respectively, and an open account obligation to FWDA II in the amount of $ 120,000 payable in 1994. Frank Dietrich acquired an interest in MCDA in 1981 through his wholly owned subchapter S corporation, Seto, under the following terms: a cash down payment of $ 12,500, three negotiable promissory notes due March 1, 1982, 1983, and 1984, respectively, each in the amount of $ 12,500, and a nonnegotiable promissory note in the amount of $ 100,000 due January 15, 1994. Aaron Bassin acquired an interest in MCDA in 1981. *646 He made a cash down payment of $ 12,500, executed three promissory notes due March 1, 1982, 1983, and 1984, respectively, each in the amount of $ 12,500, and executed a nonnegotiable promissory note in the amount of $ 100,000 due January 15, 1994. Herman David left all of his personal investment decisions to his children. Mr. David's son, Sheldon, learned about MCDA II from his accounting firm. Herman David acquired an interest in MCDA II in 1981. He made a cash down payment of $ 15,000, executed two negotiable notes due March 1, 1982, and 1983, respectively, each in the amount of $ 15,000, and arranged an open account obligation for an amount in excess of $ 100,000 payable in 1994. Nicholas L. Arky acquired an interest in MCDA II in 1981. He made a cash down payment of $ 10,000, executed two negotiable promissory notes due March 1, 1982, and 1983, respectively, each in the amount of $ 10,000, and arranged an open account obligation payable to MCDA II in the amount of $ 120,000 due in 1994. Tround International, Inc., (hereinafter Tround) was incorporated in the State of Delaware on February 12, 1973, for the purpose of developing certain technology called the open chamber *647 system. David Dardick, president and principal shareholder of Tround, invented the open chamber system as a weapon system suitable for military applications. Tround's principal office, from its inception in 1973 through December 31, 1982, was located at 211 East 70th Street, New York, New York, which address was the apartment of David Dardick. His son, Steven M. Dardick, was vice president and director of Tround in 1980 and he became a full-time employee of Tround in 1981. Prior to 1981, Steven M. Dardick (Dardick) was employed by TRW, Inc. (TRW), for a number of years in various capacities. From 1975 to 1980 Dardick was general manager of TRW's Turbine Components Plant which manufactured jet engine components. Dardick does not have a background in oil and gas drilling. John Milling, an attorney who has been associated with Tround since 1973, is chairman of the board of Tround and a stockholder of the corporation. Tround is the owner of the outstanding patents and know-how which comprise the technology known as the open chamber system. The open chamber system is an ordinance or gun technology. The basic mechanism of an open chamber gun is a rotating gun cylinder with recesses *648 cut in the side to accommodate the ammunition. The ammunition for the system is fed laterally into the chamber and as the gun cylinder rotates into the firing position, the chamber recess is closed by the fixed top structure of the main frame of the gun-type apparatus. Once secured by the main frame of the gun, a charge is ignited and the gases generated by the ignited substance project the projectile forward through the barrel. The gun cylinder then rotates and ejects the spent cartridge to one side. Tround undertook to adapt the open chamber system to the development of a deep-hole oil and gas drill assembly (hereinafter the Terra-Drill), which, by pre-fracturing rock with high velocity projectiles which fired, through triple gun barrels in advance of a modified conventional rotary drill bit, would enable the bit to penetrate through rock at a faster rate. The gun assembly included a magazine for storing the ammunition and, on top of the magazine, a power source and a gear drive system to operate the whole mechanism. The mechanism is housed in a so-called drill-skirt which is attached to and functions as part of the drill-string. In oil field drilling operations, drilling *649 fluid, commonly called mud, is customarily utilized in the borehole while drilling. Almost all oil and gas drilling is done with mud as the flushing medium. The mud is used to counterbalance formation pressure, support the borehole walls, cool the drill bit, and to serve as a medium to carry rock chip debris to the surface. In oil and gas drilling with the Terra-Drill in the mud environment a mud valve is required as part of the assembly to prevent mud from making the drill inoperative by entering the gun barrels and flooding the gun system. Tround has been unsuccessful in its efforts to develop a functioning mud valve for use in the field and its development is still in the laboratory stage. In an early development stage, Tround began automatic cycling testing with a ball-seal valve technique. With automatic cycling, the ball-seal did not move from the sealed position quickly enough to avoid contact with the fired projectile. If the projectile clipped the ball-seal, it would cause the gun barrel to explode. Tround also discovered that the ball-seal life, even when it was not clipped by projectiles, lasted only from 100 to 150 cycles, which would not be enough to empty the magazine *650 on the gun assembly. Moreover, while laboratory tests for the mud valve at simulated 10,000-foot pressures were partially successful, it was discovered that the ball-seal would not close satisfactorily at lower pressures. In 1980, Tround was in financial straits and considered raising capital in a public offering of its stock through a registered broker/dealer, Norbay Securities, Inc. (Norbay). Ben Taormina was president of Norbay. Mr. Taormina suggested that financing for Tround might be available from Herman Finesod in connection with one of Mr. Finesod's proposed tax shelter projects. After discussions with Mr. Finesod, Tround decided to defer its public stock offering. Mitchell Petroleum Technology Corporation (Mitchell) was formed on July 24, 1980, under the laws of the State of Delaware. On November 11, 1980, Tround and Mitchell entered into a license agreement which was amended several times. Under the terms of the agreement, Tround granted Mitchell during a designated period the exclusive right to use, lease and sell open chamber drills and triangular rounds therefor solely for the licensed use in the licensed territory. Licensed use is defined in the agreement as *651 the exploration for and recovery of oil and gas only. Licensed territory consisted of the United States and Canada, but excluded certain portions of such territory in accordance with the provisions of the agreement. Section 4.2 of the agreement provided that the rights and licenses granted to Mitchell were subject to a reserved right and license in Tround to sell open chamber drills and triangular rounds anywhere in the licensed territory and for use therein. Section 6.6 of the agreement provided that all sales or rentals of the open chamber drills by Tround for licensed use in the United States and Canada, prior to the termination date of the agreement, would be at a minimum sales price of $ 100,000 per drill or at a rental reasonably based on such minimum sales price, together with a royalty payable to Tround by the purchaser or renter of such drill in an amount not less than one percent of the selling price of all oil and gas recovered from wells which were sunk with the use of such drill. Pursuant to the license agreement, as amended, Tround, with the concurrence of Mitchell, was permitted to accept a larger rental in lieu of the payment of the 1-percent royalty. Under section *652 7.1 of the original license agreement, Mitchell agreed to pay the full amount of a "cutoff license fee" of $ 2,000,000 to Tround by December 31, 1981. Mitchell also agreed to pay an advance license fee to Tround in the total amount of $ 1,600,000 ($ 100,000 previously paid, $ 500,000 on or before December 15, 1980, and $ 1,000,000 on or before January 15, 1981) which would be recovered by Mitchell by way of credits against future license fees payable by Mitchell under the agreement. An amendment to the license agreement dated January 15, 1981, verified that an advance license fee of $ 600,000 had heretofore been paid by Mitchell to Tround and further stated that Mitchell was obligated to pay additional amounts of $ 500,000 on March 20, 1981, and $ 500,000 on May 20, 1981. Section 7.1 of the license agreement was also amended as of January 15, 1981, as follows: 7.1(c) [Mitchell] agrees to assign to [Tround] if, as and when received, a portion of any notes it receives from its sublicensees in payment of the sublicense of the rights hereunder. The portion of the notes to be assigned in each year shall be determined in the first year of such sublicense, and shall be equal *653 to the portion of such sublicensee's note delivered to [Mitchell] in the first year of such sublicense to the extent that it is nonrecourse (i.e., if the sublicensee is a limited partnership to the extent of the portion of the note that is not assumed by the limited partners).
Under section 6.2 of the license agreement, Tround agreed to apply all cash receipts from Mitchell solely and exclusively for the development of open chamber drills and triangular rounds until Tround produced and completed the production engineering for a production-quality prototype open chamber drill and triangular rounds. Under section 6.3 of the license agreement, in the event Tround did not develop one working prototype, not of production quality, of an open chamber drill and triangular rounds within nine months of its receipt of the $ 500,000 installment of the advance license fee, Mitchell could elect to itself develop a working prototype with the assistance of Tround. Under section 6.7 of the agreement, in the event Tround failed to manufacture or cause to be manufactured, one production quality open chamber drill and triangular rounds within any twelve-month period ended on or before December 31, 1984, Mitchell *654 had the right to undertake the development of these items to production quality with the assistance of Tround. Section 6.6 of the license agreement provided in part as follows: All sales or rentals of Open Chamber Drills by TRI [Tround] for Licensed Use in the United States and Canada, prior to the Termination Date, shall be at a per drill selling price of not less than $ 100,000 or at a rental reasonably based upon such minimum selling price, together with a royalty payable to TRI [Tround] by the purchaser or renter of such drill in an amount equal to not less than one percent of the selling price of any and all oil and gas recovered from wells which were sunk with the use of such drill. * * *
On April 20, 1982, section 6.6 of the license agreement was amended to require Mitchell, at Tround's request, to charge a higher rental or sales price in lieu of the 1-percent royalty provided for in section 6.6 of the agreement. When the license agreement was entered into by Tround and Mitchell in November 1980, only a scale model of the Terra Drill existed. The license fee of $ 1,600,000 payable under the agreement by Mitchell to Tround was to be used to develop a *655 prototype of the drill. Mitchell sublicensed its rights to the Terra-Drill to the six limited partnerships herein involved. The duration of each sublicense agreement was for a term of five years. Pursuant to the sublicense agreements, the fees for the sublicenses were payable partly in cash and partly by notes. The fees were designated on an annual basis. Pursuant to its sublicense agreement with Mitchell dated December 31, 1980, GSLDA was obligated to pay a portion of the sublicense fee in cash of approximately $ 1,000,000 in each of the first three years and, in addition, GSLDA executed notes payable to Mitchell dated December 31, 1980 ($ 10,103,440), October 1, 1981 ($ 7,643,472), October 1, 1982 ($ 7,650,432), October 1, 1983 ($ 8,700,000), and October 1, 1984 ($ 8,700,000). The due dates of the notes, June 15, 1993, were subsequently extended for an additional five years. Pursuant to its sublicense agreement with Mitchell dated December 31, 1980, RMDA, in its first three years, was obligated to pay annual license fees for each of the fiscal years commencing October 1, 1980, 1981, and 1982 of approximately $ 10,000,000, payable by notes to the extent of $ 8,412,212 in each *656 of the first three fiscal years involved. Pursuant to its sublicense agreement with Mitchell dated December 31, 1980, FWDA in the first three years was obligated to pay annual license fees in each of the fiscal years commencing October 1, 1981, 1982, and 1983 in excess of $ 10,000,000, payable partially by note in each of the first three fiscal years involved in excess of $ 9,000,000. Pursuant to its sublicense agreement with Mitchell dated December 31, 1981, FWDA II, in the first three years, was obligated to pay annual license fees in each of the fiscal years commencing October 1, 1981, 1982, and 1983 of approximately $ 5,000,000 payable by note in each of said fiscal years to the extent of $ 4,819,500, $ 4,087,650, and $ 4,087,650, respectively. Pursuant to its sublicense agreement with Mitchell dated October 30, 1981, MCDA, in the first three years, was obligated to pay annual license fees of $ 3,250,000 in each of the fiscal years commencing November 1, 1981, 1982, and 1983, partially payable by note in each of said fiscal years in the amount of $ 3,250,000. Pursuant to its sublicense agreement with Mitchell dated December 31, 1981, MCDA II, in the first three years, was obligated *657 to pay annual license fees in each of the fiscal years commencing October 1, 1982, 1983, and 1984 of approximately $ 8,000,000, partially payable by note in each of said fiscal year in the amount of $ 7,318,500, $ 6,997,200 and $ 6,997,200, respectively. The aggregate of the sublicense fee obligations of the six limited partnerships here involved to Mitchell under the five-year sublicense agreements was approximately $ 225,000,000. No orders were taken by the six limited partnerships for the Terra-Drill at any time. The November 18, 1980, offering memorandum of GSLDA stated that the partnership was formed to engage in three different oil and gas related businesses: (1) a development drilling program in Ohio, (2) exploratory drilling in the Overthrust Belt in Utah and Colorado, and (3) the acquisition of an exclusive sublicense to use, sell and lease a new drilling product currently being developed, the Terra-Drill, in the western half of the States of Oklahoma and Alaska and for exploratory drilling on its exploratory property located in the Overthrust Belt in Utah and Colorado. The partnership planned to offer 280 units at $ 150,000 per unit, with each investor obligated to *658 pay $ 12,500 on subscription and the balance evidenced by three 7-percent promissory notes, one in the amount of $ 12,500 payable March 1, 1981, the second in the amount of $ 12,500 payable on March 1, 1982, and the third in the amount of $ 112,500 payable on January 15, 1993. The offering memorandum set forth the anticipated tax losses to be incurred by each limited partner during the first three years as follows: Cash
Estimated
Loss as a Percent
Year
Investment
Tax Loss
of Cash Invested
1980
$ 12,500
($ 50,000)
400 percent
1981
12,500
($ 50,000)
400 percent
1982
12,500
($ 50,000)
400 percent
The private offering memorandum and promotional brochure for the GSLDA limited partnership represented that the partnership would drill 42 development wells on the Sheets Run Tract in Washington County, Ohio. The tract was located in southeastern Ohio. The GSLDA promotional brochure projected reserves of 16,800 barrels of oil per well over eight years and also projected net revenues of $ 201,358,533. The November 18, 1980, RMDA offering memorandum stated that the partnership was formed to engage in (1) a development drilling program *659 in Ohio, (2) exploratory drilling in the Overthrust Belt in Utah, and (3) the acquisition of an exclusive license to use, sell, and lease a new drilling product currently being developed, the Terra-Drill, in east and west Texas and for exploratory drilling on exploratory property in Utah. The partnership planned to offer 560 units at $ 150,000 per unit. The method of payment by the investor for each unit was similar to that in the GSLDA partnership. The offering memorandum set forth the anticipated tax losses to be incurred by each limited partner in the first three years as follows: Cash
Estimated
Loss as a Percent
Year
Investment
Tax Loss
of Cash Invested
1980
$ 12,500
($ 50,000)
400 percent
1981
12,500
($ 50,000)
400 percent
1982
12,500
($ 50,000)
400 percent The private offering memorandum and promotional brochure for the RMDA limited partnership represented that the partnership drill 53 wells in the Berea Formation and four wells in the Medina Formation in Morgan County, Ohio. The RMDA promotional brochure projected net revenue of $ 378,767,809 through 1996 based on reserves of 43,424 barrels of oil per Medina well and 9,522 *660 barrels of oil and 119,800 MCF of gas per Berea well. The May 11, 1981, FWDA offering memorandum for its 1981 oil and gas program stated that the partnership was formed to engage in (1) a development drilling program in Ohio, (2) exploratory drilling in Utah, and (3) the acquisition of a license to use, sell or lease a new drilling product currently being developed, the Terra-Drill, in central and east Texas and on its exploratory property in Utah. The partnership planned to offer 220 units at $ 157,500 per unit, with each investor obligated to pay $ 15,000 on subscription and the balance evidenced by three eight percent promissory notes, one in the amount of $ 15,000 payable on March 1, 1982, the second in the amount of $ 15,000 payable one March 1, 1983, and the third payable on January 15, 1994, in the amount of $ 112,500. The offering memorandum set forth the anticipated tax losses to be incurred by each investing partner during the first three years as follows: Cash
Estimated
Loss as a Percent
Year
Investment
Tax Loss
of Cash Invested
1981
$ 15,000
($ 52,500)
350 percent
1982
15,000
($ 52,500)
350 percent
1983
15,000
($ 52,500)
350 percent
*661 The private offering memorandum and promotional brochure for the FWDA limited partnership represented that the partnership would drill some 27 wells by December 31, 1983, in the same Berea Formation and Medina Formation (in Morgan County, Ohio) as RMDA. FWDA proposed to allocate a maximum of $ 3,960,000 over three years for the drilling program in Ohio. FWDA also budgeted $ 175,000 for exploratory drilling in Utah. The promotional brochure cited the same figures for projected reserves as those used in the RMDA promotional brochure. The December 1, 1981, FWDA II offering memorandum stated that the partnership was formed to engage in (1) a development drilling program in Tennessee and Oklahoma, (2) an exploratory drilling program in the Overthrust Belt in Utah, and (3) the acquisition of a sublicense to sell, lease, sublicense, or otherwise utilize a new drilling product currently being developed, the Terra-Drill, in California, Louisiana, Ohio, and Utah and to use the product on its own exploratory property. The partnership planned to offer 334 units at $ 150,000 per unit, with each investor obligated to pay $ 10,000 on subscription and the balance divided among three 8-percent *662 promissory notes, one in the amount of $ 10,000 payable on March 1, 1982, the second in the amount of $ 10,000 payable on March 1, 1983, and the third in the amount of $ 120,000 payable on January 15, 1994. The offering memorandum set forth the anticipated tax losses to be incurred by each investing partner during the first three years as follows: Cash
Estimated
Loss as a Percent
Year
Investment
Tax Loss
of Cash Invested
1981
$ 10,000
($ 40,000)
400 percent
1982
10,000
($ 40,000)
400 percent
1983
10,000
($ 40,000)
400 percent
The private offering memorandum and promotional brochure represented that the partnership would allocate a maximum of $ 3,707,400 over a 3-year period to drill development wells or leases in the Fort Payne-Mounteagle Formation in Tennessee and in the Northeast Sparks Prospect, Lincoln County, Oklahoma. The promotional brochure projected net revenues from the development drilling program in the amount of $ 174,656,773 based on the following assumptions: each well in the Northeast Sparks Prospect would produce 100,000 MCF of gas and 61,425 barrels of oil over a 20-year life; (2) each Tennessee well would produce *663 100,000 MCF of gas and 35,000 barrels of oil over a 15-year life; and (3) escalation of oil prices at 11 percent per year and gas prices at 14 percent per year over a period of years. The January 31, 1981, offering memorandum of MCDA stated that the partnership was formed to engage in (1) a development drilling program in Kansas and Oklahoma, (2) exploratory drilling in the Overthrust Belt in Utah, and (3) the acquisition of an exclusive sublicense to use, sell, and lease a new drilling product currently being developed, the Terra-Drill, in the State of Alaska and for exploratory drilling on its own exploration property in Utah. The partnership planned to offer 100 units at $ 150,000 per unit, with each investor obligated to pay $ 12,500 on subscription and the balance evidenced by four 8-percent promissory notes, one in the amount of $ 12,500 payable on March 1, 1982, the second in the amount of $ 12,500 payable on March 1, 1983, the third in the amount of $ 12,500 payable on March 1, 1984, and the forth in the amount of $ 100,000 payable on January 15, 1994. The offering memorandum set forth the anticipated tax losses to be incurred by each investing partner during the first *664 four years as follows: Cash
Estimated
Loss as a Percent
Year
Investment
Tax Loss
of Cash Invested
1981
$ 12,500
($ 37,500)
300 percent
1982
12,500
($ 37,500)
300 percent
1983
12,500
($ 37,500)
300 percent
1984
12,500
($ 37,500)
300 percent
The private offering memorandum and promotional brochure for the MCDA limited partnership represented that the partnership would acquire a 100-percent working interest in a 46-well development program in the New Albany Field area, Wilson County, Kansas. The promotional brochure projected future net earnings from the developmental oil and gas program of $ 173,372,910, representing a gross return on the initial $ 2,000,000 allocated to the drilling programs of about 86-to-1. Intense drilling activity has been carried on in this area since the early 1900's. After drilling two dry wells, MCDA did not engage in any further drilling activity in Kansas. MCDA also participated in developmental drilling in the Sacatosa Field prospect and in White County and Morgan County, Tennessee. The October 26, 1981, offering memorandum of MCDA II stated the partnership was formed to engage in (1) a development *665 drilling program in Tennessee and Oklahoma, (2) exploratory drilling in the Overthrust Belt in Utah, and (3) the acquisition of an exclusive sublicense to use, sell, and lease a new drilling product currently being developed, the Terra-Drill, in Kansas and north and west Texas and for exploratory drilling on its own exploration property. The partnership planned to offer 334 units at $ 150,000 per unit with each investor obligated to pay $ 10,000 on subscription and the balance evidenced by three 8-percent promissory notes, one in the amount of $ 10,000 payable on March 1, 1982, the second in the amount of $ 10,000 payable on March 1, 1983, and the third in the amount of $ 120,000 payable on January 15, 1994. The offering memorandum set forth the anticipated tax losses to be incurred by each investor in the first three years as follows: Cash
Estimated
Loss as a Percent
Year
Investment
Tax Loss
of Cash Invested
1981
$ 10,000
($ 40,000)
400 percent
1982
10,000
($ 40,000)
400 percent
1983
10,000
($ 40,000) 400 percent The private offering memorandum and promotional brochure for the MCDA II limited partnership represented that the *666 partnership would participate in developmental wells at a fixed cost of $ 3,707,400. The proposed wells were to be drilled on leases in Tennessee and Lincoln County, Oklahoma. The MCDA II promotional brochure projected future net revenues from the developmental drilling program through 1995 in the amount of $ 193,775,028. The projection was based on reserve estimates of 57,800 barrels of oil and 544,000 MCF of gas for each Oklahoma well and 35,000 barrels of oil and 160,200 MCF of gas for each Tennessee well. Each of the limited partnerships represented in its private offering memorandum that it would participate in exploratory drilling in an area of hard rock property in the Overthrust Belt in Utah. Each partnership budgeted $ 175,000 to conduct the exploratory drilling. No drilling was ever conducted by any of the partnerships on the leases in the Utah Overthrust Belt. The portions of the sublicense fees payable by note by the limited partnerships to Mitchell were designated as partially recourse and partially nonrecourse pursuant to a formula in the sublicense agreements. The nonrecourse portion of the notes was in turn assigned by Mitchell to Tround. The total amount *667 of nonrecourse notes assigned by Mitchell to Tround for all the years covered by the sublicense agreements was $ 35,188,384. The promotional brochure for the limited partnerships contained projected oil production revenues and cash flow for the years involved. Generally, the projections covered the period from the date of the offering of the partnership units to approximately 1995. The oil and gas projections in the brochures assumed a reinvestment of 50 percent of the proceeds generated by the oil and gas drilling programs. The brochures also represented that cash flow was anticipated to be sufficient to repay the long-term notes prior to their stated due dates. The GSLDA promotional brochure stated that in the event the long-term notes had not been fully paid prior to the due date, the general partners were authorized to borrow against reserves to prepay the note. The borrowing would be nonrecourse and the funds applied would fully discharge the investor's obligation on his long-term note. The promotional brochure further represented that only in the event the partnership cash flow was insufficient to pay the note, and only in the event that the partnership's proven reserves *668 were insufficient to permit the partnership to borrow enough to pay the long-term note, would an investor be required to personally pay the note. The brochure noted that it was only the principal of the note an investor would have to pay since the interest on the long-term note was nonrecourse. Similar representations were made with respect to all of the limited partnerships here involved. In November 1980, when the license agreement was entered into by Tround and Mitchell, the Terra-Drill was not in existence. Only the design concept existed. Among the complex design problems that confronted Tround, the development of a workable mud valve posed the greatest technical challenge. The technical difficulty in developing the mud valve was attributable in part to the requirement that the mud valve was allowed only 125-150/1,000,000 of a second to open and allow a projectile to exit from the gun barrel and then close to prevent drilling mud from flowing into the firing mechanism. After prolonged testing of the gun mechanism, the entire system was integrated with a drilling rig in or about January 1982, when the first actual drilling test was conducted at shallow depths with the Terra-Drill *669 prototype. Tround conducted a series of tests in limestone and hard rock formations during 1982. On May 14, 1982, Tround filed a prospectus with respect to a public offering of its stock. The prospectus stated that the securities were considered by Tround to be "highly speculative in nature and involve a high degree of risk." Tround anticipated the amount to be raised from the offering was $ 2,750,000. However, only about $ 1,600,000 was actually realized. As of December 31, 1982, the Tround technology known collectively as the open chamber system had yet to be successfully commercially exploited. In 1983 Tround built two additional prototypes, a 9-7/8-inch drill and a 15-inch drill, incorporating changes based on the tests. In 1984 the 9-7/8-inch drill was tested to about 1300 feet and in 1985 it was used in an actual gas well test. Tround continued its unsuccessful efforts to develop the mud valve in 1985 and to a limited extent in 1986. A functional Terra-Drill for hard rock drilling was never developed. GSLDA entered into a turnkey drilling contract dated January 26, 1981, with Williston Drilling, Inc., for the drilling of 28 wells on the Archer's Fork and Sheets Run *670 Tracts in Washington County, Ohio. GSLDA entered into a drilling agreement with Oklahoma Drilling Corp. on June 2, 1982, with respect to the Colona Prospect, Woodruff County, Arkansas. GSLDA received assignments of oil and gas leases from Williston Oil Corporation dated July 2, 1981, with respect to five leases in Washington County, Ohio. GSLDA received a partial assignment of an oil and gas lease from Omega Minerals, Inc., dated November 23, 1982, with respect to the Hoelscher Lease in Runnels County, Texas. GSLDA received assignments of oil and gas leases from Shah Oil Co., Inc., dated June 24, 1982, of a 37-1/2-percent net revenue working interest in two 20-acre tracts in Young County, Texas. GSLDA received an assignment of an oil and gas lease dated August 26, 1981, from Williston Oil Corporation with respect to the Lyder Lease in Miami County, Kansas. GSLDA drilled four wells in Washington County, Ohio. Two of the wells were drilled to 2,600 feet and two wells were drilled to 4,000 feet. Three of the four wells came in and produced oil and gas for some time. GSLDA drilled one well in 1984 in central Ohio which is still producing. GSLDA took partial interests in other *671 prospects together with the other partnerships and drilling was performed on each of these. GSLDA filed timely partnership returns for the taxable years 1980, 1981 and 1982. Each of the returns showed a net operating loss resulting from the partnership activities. The losses claimed in each of said years by GSLDA included deductions for sublicense fees paid to Mitchell. During the period here involved RMDA drilled oil and/or gas wells on each of the following leases in Ohio: Spencer, Scott, County Infirmary, Harkins, Boll, Bebout, Adkins, Wood, Strode, and Ward. RMDA entered into a drilling contract with O'Neal Petroleum, Inc., dated December 14, 1981, with respect to six wells on various leases in Morgan County, Ohio. By letter dated May 4, 1982, RMDA authorized the use of completion funds for another prospect (Jutte #2) in Morgan County, Ohio. In 1982 RMDA entered into drilling agreements with O'Neal Petroleum, Inc., with respect to a prospect in Illinois and a prospect in Ohio. In 1981 RMDA entered into a turnkey drilling contract with O'Neal Petroleum, Inc., for the drilling of 20 wells on various leases in Morgan County, Ohio. In 1981 RMDA also entered into a turnkey *672 drilling contract with O'Neal Petroleum, Inc., with respect to nine additional leases located in Morgan County, Ohio. RMDA drilled a well on the Meyer #1 lease and received drilling and production reports with respect to said well from the Oklahoma Drilling Company in 1982 and 1983. David Harmon, a geologist with some 35 years of activity in the oil and gas business primarily in Ohio, was the vice president for exploration for O'Neal Petroleum, Inc., at the time RMDA embarked on its oil and gas drilling program. Mr. Harmon was involved in the determination with respect to drilling in the Berea Formation in Windsor Township, Ohio for both RMDA and FWDA. RMDA timely filed partnership returns for taxable years 1980, 1981 and 1982. Each of the returns reflected a net operating loss from the partnership activities. The losses claimed by RMDA for each of the taxable years 1980, 1981 and 1982 included deductions claimed by RMDA for sublicense fees paid to Mitchell. FWDA entered into a turnkey drilling contract dated January 1, 1982, with O'Neal Petroleum, Inc., to drill 10 wells on ten separate leases in Ohio and on December 30, 1982, entered into an additional turnkey drilling *673 contract with O'Neal Petroleum, Inc., to drill five additional wells on five separate leases in Morgan County, Ohio. In July 1982, FWDA entered into (1) a drilling contract with O'Neal Petroleum, Inc., to drill ten wells on a lease located in Jefferson County, Ohio and (2) a drilling contract with O'Neal Petroleum, Inc., to drill a well or a lease in Richmond County, Illinois. On June 17, 1983, FWDA entered into a turnkey drilling contract with O'Neal Petroleum, Inc., with respect to five wells on separate leases located in Morgan County, Ohio, and on January 24, 1984, received from O'Neal Petroleum Inc., four assignments of 20-percent working interests in four of the aforementioned leases in Morgan County, Ohio. In March 1986, FWDA entered into a prospect agreement with Diversified Operating Corporation with respect to the Stuarco Reentry Prospect in Weld County, Colorado. FWDA filed its partnership returns for the taxable year 1981 which reflected a net operating loss for said year. The net operating loss included a deduction for sublicense fees paid to Mitchell. In 1982 FWDA II entered into a drilling contract and an operating agreement with Oklahoma Drilling Corporation *674 with respect to (1) the Simpson Prospect in Garfield County, Oklahoma; (2) the Batson Prospect, Cooper No. 1 in Johnson County, Arkansas; and (3) the Sooner Trend Prospect, Hare No. 1 in Garfield County, Oklahoma. FWDA II held an interest in a well known as the Webb No. 1 Prospect in Taylor County, Texas, effective October 10, 1983, and also held an interest in an oil and gas well known as the Allen No. 1 Prospect in Taylor County, Texas, effective December 14, 1983. FWDA II also held interests in eight wells located in Cumberland County, Tennessee pursuant to an operating agreement dated October 11, 1984. FWDA II filed its partnership returns for the taxable years 1981 and 1982 and reported net operating losses in both taxable years. The losses claimed by FWDA II for both taxable years included deductions claimed for sublicense fees paid to Mitchell. MCDA entered into a drilling contract in 1982 with Oklahoma Drilling Corporation with respect to the Simpson Prospect in Garfield, Oklahoma, a drilling contract and operating agreement with Oklahoma Drilling Corporation with respect to the Batson Prospect, Cooper No. 1 in Johnson County, Arkansas, a drilling contract and operating *675 agreement with Oklahoma Drilling Corporation with respect to the Sooner Trend Prospect, Hare No. 1 in Garfield County, Oklahoma, and a drilling contract and operating agreement with Kansas Energy Corporation with respect to the Hazel West Prospect in Stafford County, Kansas. In 1983 and 1984 MCDA held working interests in oil and gas in two wells in Taylor County, Texas, and an oil and gas well in McClain County, Oklahoma. MCDA also acquired an interest in the Colona Prospect in Arkansas from Exxon Petroleum Corporation which turned out to be a dry well. MCDA timely filed partnership returns for the taxable year 1981. MCDA reported a net operating loss for said taxable year which included a deduction claimed by MCDA for sublicense fees paid to Mitchell. In 1982 MCDA II entered into a drilling contract and operating agreement with Oklahoma Drilling Corporation with respect to (1) the Simpson Prospect in Garfield County, Oklahoma, (2) the Batson Prospect in Johnson County, Arkansas, (3) the Sooner Trend Prospect, Hare No. 1 in Garfield County, Oklahoma, and (4) the State School lease in Kay County, Oklahoma. The lease in Kay County, Oklahoma, was drilled by MCDA II to a depth *676 of approximately 3,500 feet at a cost of about $ 200,000 with an estimated time of payout of four years. In 1982 MCDA II also entered into a drilling contract and operating agreement with Kansas Energy Corporation with respect to the Hazel West Prospect in Stafford County, Kansas. In 1983 MCDA II held an interest in an oil and gas well known as the Webb No. 1 Prospect in Taylor County, Texas, and an interest in an oil and gas well known as the Allen No.1 Prospect in Taylor County, Texas. MCDA II timely filed partnership returns for the taxable years 1981 and 1982 and reported net operating losses for both years. The net operating losses included the deductions claimed by MCDA II for sublicense fees paid to Mitchell. OPINION Respondent disallowed deductions claimed by petitioners for their respective pro-rata shares of the losses generated by the six limited partnerships here involved: GSLDA, RMDA, FWDA, FWDA II, MCDA and MCDA II. Each of the limited partnerships was formed with the stated purpose of engaging in three different oil and gas related businesses: (1) a development drilling program in designated regions, (2) exploratory drilling in the Overthrust Belt in Utah and *677 Colorado, and (3) the acquisition of an exclusive sublicense to use, sell, and lease a new drilling product, the Terra-Drill, in designated territories. The losses generated by the limited partnerships are represented in large part by the sublicense fees purportedly incurred in the acquisition of the Terra-Drill sublicenses. The losses also included the partnerships' costs incurred with respect to their respective oil and gas programs. As grounds for the disallowance of the claimed losses, respondent asserts that neither the Terra-Drill sublicense programs nor the oil and gas drilling programs were activities entered into for profit within the meaning of section 183. Respondent also makes certain alternative arguments in support of his determinations. Initially, we dispose of petitioners' contention that with respect to the oil and gas drilling activities of the limited partnerships, respondent has the burden of proof. We disagree with petitioners. In the statutory notice of deficiency sent to petitioners all of the claimed losses arising from their respective partnership activities were disallowed in full. Moreover, the petitions and answers filed in these cases squarely raise *678 the issue of whether or not all of the transactions of the respective partnerships were entered into for profit. It is clear from the record that petitioners were fully aware of this aspect of the issues which they needed to confront. Consequently, we see no reason to depart in this instance from the general rule that the burden of proof is on petitioners. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). At the trial, Exhibits UE and UF were admitted into evidence over petitioners' objections and the Court directed the parties to address the question of the admissibility of the two exhibits on brief. We have considered the arguments presented on brief as well as the circumstances surrounding the two exhibits. Both exhibits are letters signed by Mr. Herman Finesod and relate to investors in RMDA. Both letters, in essence, indicate a readiness to release an investor from any unpaid recourse obligations upon the investor's transfer of his partnership interest to Mitchell Petroleum Technology Corp. Petitioners' counsel was apprised of one of the two letters at a stipulation of facts conference with respondent's counsel about a month prior to the commencement *679 of trial. The second letter, which reflects in large part the factual content of the letter previously made available to petitioners' counsel, was first obtained by respondent's counsel some four days prior to commencement of trial and was also made available at that time to petitioners' counsel. Under these circumstances, we find no merit in the contentions of petitioners' counsel that the documents were not supplied to him in timely fashion. We adhere to our ruling at the trial admitting exhibits UE and UF in evidence. Whether or not the activities in question were engaged in for profit must be determined at the partnership level. Brannen v. Commissioner, 78 T.C. 471 (1982), affd. 722 F.2d 695 (11th Cir. 1984).In view of the genesis and the strikingly similar structures and avowed programs of the six limited partnerships herein involved, our discussion and the conclusions reached equally applicable to all under section 183 will be conclusive with respect to each of the limited partnerships. Whether a partnership engages in an activity for profit turns on whether the partnership entered into or carried on the activity with an actual and honest *680 objective of making a profit. Dreicer v. Commissioner, 78 T.C. 642, 644-645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983).The expectation of making a profit need not be a reasonable one; it is sufficient if the objective of making a profit is bona fide. Fox v. Commissioner, 80 T.C. 972, 1006 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner, 731 F.2d 230 (4th Cir. 1984), affd. without published opinion sub nom. Zemel v. Commissioner, 734 F.2d 9 (3d Cir. 1984), Rosenblatt v. Commissioner, 734 F.2d 7 (3d Cir. 1984), Kratsa v. Commissioner, 734 F.2d 6 (3d Cir. 1984), Leffel v. Commissioner, 734 F.2d 6 (3d Cir. 1984), Hook v. Commissioner, 734 F.2d 5 (3d Cir. 1984).In this context, "profit" means economic profit, exclusive of tax savings. Beck v. Commissioner, 85 T.C. 557, 570 (1985); Herrick v. Commissioner, 85 T.C. 237, 255 (1985). In determining whether an activity is engaged in for profit, we consider a nonexclusive *681 list of some nine relevant factors contained in section 1.183-2(b), Income Tax Regs. These factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayers or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which were earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Not all of the factors are applicable or appropriate for every case, Abramson v. Commissioner, 86 T.C. 360, 371 (1986). No single factor is determinative; rather, the issue is one of fact to be resolved by examining all of the circumstances. Waddell v. Commissioner, 86 T.C. 848, 891 (1986), affd. 841 F.2d 264 (9th Cir. 1988).Greater weight is given to objective facts rather than to the parties' mere statements of their intent. *682 Sec. 1.183-2(a), Income Tax Regs.; Engdahl v. Commissioner, 72 T.C. 659, 666 (1979). Although each of the partnerships was formed with the stated purpose of engaging in three activities, the acquisition of a sublicense to market the Terra-Drill in designated territory, the development drilling program in specified areas, and the exploratory drilling program in the so-called Overthrust Belt in Utah, no exploratory drilling was ever conducted by any of the partnerships in the Overthrust Belt. We, therefore, turn to an examination of the economic validity of the remaining two activities described in the offering memorandum of each partnership. Herman Finesod is sole stockholder of M&J Holding Company (M&J) which holds the stock of various corporations including Jackie Fine Arts, Hambrose Leasing, Hambrose Stamps, Worldco Services Group, Petro-Tech, Mitchell Energy and Mitchell Petroleum Technology Corporation (Mitchell). Mr. Finesod is president of the aforementioned corporations. James Haber, a certified public accountant, was secretary-treasurer of Mitchell. In 1979 Mr. Finesod began to consider the formation of limited partnerships as vehicles for oil and *683 gas programs combined with new forms of technology. In 1980 Mr. Finesod became interested in a new technology, the Terra-Drill, being developed by Tround International, Inc. (Tround). Tround was incorporated in 1973 for the purpose of developing certain ordinance or gun technology called the open chamber system. The basic mechanism of an open chamber gun is a rotating gun cylinder with recesses cut in the side to accommodate the ammunition. Tround undertook to adopt the open chamber system to the development of a deep-hole oil and gas drill assembly (the Terra-Drill) which would pre-fracture rock with high-velocity projectiles fired through triple gun barrels in advance of a modified conventional rotary drill bit, enabling the bit to penetrate through rock at a faster rate. Mitchell was formed in July 1980, and a few months later, on November 11, 1980, Mitchell and Tround entered into a license agreement under which Mitchell acquired the exclusive right to use, lease, and sell the new technology, but only for the exploration and recovery of oil and gas in the United States and Canada with the exclusion of some portions of such territories in accordance with other terms of the *684 license agreement. In 1980 and 1981 Mitchell paid an advance license fee to Tround in the total amount of $ 1,600,000. Mitchell thereafter sublicensed its rights in the Terra-Drill to nine different partnerships, six of which are herein included. The aggregate of the sublicense fee obligations of the six partnerships to Mitchell under the five-year sublicense agreements was approximately $ 225,000,000. In 1980 only a plastic model of the Terra-Drill was in existence. Mr. Steven Dardick, the Tround executive who was directly involved with the new technology, testified that in 1980 the Terra-Drill was still a paper concept. It was not until January 1982, that the first actual drilling test with a Terra-Drill prototype was conducted at shallow depths. Notwithstanding the absence of a functioning Terra-Drill in 1980 and 1981 the six partnerships entered into sublicense agreements with Mitchell to market the Terra-Drill and incurred obligations to make substantial fee payments annually. The terms of the sublicense agreements with the partnerships were all set beforehand by Mitchell. No real negotiations took place with the general partners for the six partnerships who had been *685 selected by Mr. Finesod after discussions with Mr. Haber and a law firm. Mr. Haber was aware in 1980 of the serious technical difficulties facing the developer of the Terra-Drill. Among the complex design problems confronting Tround, the development of a workable mud-valve posed the greatest technical challenge. The mud-valve, which was allowed only a fraction of a second to open and allow a projectile to exit from the gun barrel and then close to prevent drilling mud from incapacitating the firing mechanism, was a crucial and indispensable element in the functioning of the Terra-Drill. Tround continued its unsuccessful effort to develop a workable mud-valve through 1985 and, to a limited extent, in 1986. A functioning Terra-Drill for hard-rock drilling was never developed and no orders were ever taken by the six partnerships with respect to the Terra-Drill. John E. Heard testified as respondent's expert witness with respect to the technical aspects of the Terra-Drill. Mr. Heard is a petroleum engineer who has specialized in drilling activities. He has engaged in his profession extensively in the United States and in several foreign countries over some 34 years and is thoroughly *686 familiar with the unique problems encountered in all aspects of drilling operations. Mr. Heard identified three major technological obstacles to the effective development of the Terra Drill: (1) the mud valve; (2) the gas purge system and pressure problems; and (3) tool miniaturization. Mr. Heard considered the magnitude of the efforts of other drilling tool manufacturers to develop comparable technology as well as the report prepared by Dr. William C. Maurer in a technical review of the Terra-Drill dated October 21, 1980, in which Dr. Maurer advised Mitchell that the mud valve presented a difficult design job because of the high speed requirements and because of the high fluid pressures involved. Dr. Maurer also stated that it could take extensive testing and redesigning to develop a reliable mud valve. Mr. Heard also considered the Sandia Laboratories Report dated June 1976, which related the status of the progress of the program conducted by the Sandia Laboratories with respect to the Terra-Drill concept. The report cited the mud valve as being a questionable area of design that would require immediate prototype testing to establish feasibility. Mr. Heard concluded that Tround, *687 with its lack of adequate funding and its lack of technical personnel with oil field experience, would never be able to develop a reliable mud valve. We note that Tround was fully aware of these design difficulties in 1980 when the license agreement with Mitchell was executed. During negotiations, Tround informed Mitchell that it would require in the vicinity of $ 20,000,000 to develop a marketable Terra-Drill. Clearly, the payment of $ 1,600,000 by Mitchell to Tround was inadequate. Mr. Heard also emphasized further crucial technical problems which remained unsolved in the development of a workable Terra-Drill. In view of the high pressures existing in a deep-hole environment of oil and gas drilling, it was indispensable to the successful operation of the Terra-Drill gas mechanism to maintain an equilibrium between the gas pressure within the gun mechanism and the pressure outside the gun barrel. Failure to achieve such equilibrium would cause drilling mud to flood the barrels and gun mechanism. Moreover, it is necessary to find a method of purging the high pressure gases that build up within the gun barrels. Otherwise, the spent cartridges would be ejected back into the *688 gun mechanism with great force, damaging or jamming the gun. It does not appear that Tround has solved this problem. Mr. Heard also stated that the serious problem of miniaturization also remained unsolved. Certain standards have been established in the oil and gas drilling industry, including the material strength and restricted diameter of the steel casing used in drilling wells to meet varying conditions of pressure and collapse resistance. Miniaturization of the Terra-Drill would be essential in order to meet the standardized requirements prevailing within the oil industry. It does not appear that Tround has solved this particular problem. Mr. Heard believed that the miniaturization problem had to be solved before the Terra-Drill could be used for deep well drilling. Edwin C. Broun, Jr., testified as respondent's expert witness with respect to the rights obtained by the six partnerships under their respective sublicenses to market the Terra-Drill. Mr. Broun has a B.S. degree in petroleum engineering and has worked extensively in the oil and gas drilling industry over a period of some 41 years. He analyzed the license agreement and its terms between Mitchell and Tround *689 against the background of oil industry practices and also analyzed the commercial acceptance, or lack of it, of sublicenses for oil industry technology. He indicated that the transaction in which Mitchell licensed a tool and a system that was not yet operable and then sublicense it to limited partnerships for substantial amounts was not justifiable. He further indicated that sublicenses of technology were little used in the energy services industry. We adopt the conclusions reached by respondent's expert witnesses with respect to the Terra-Drill and to the absence of economic validity of the sublicensing transactions under the circumstances presented by the record. We have considered the testimony and report of petitioners' expert witness, Richard Golob. Mr. Golob is managing director of World Information Systems, a marketing and consulting firm. Mr. Golob is engaged primarily in the field of market research and analysis. He examined existing reports and studies and concluded that the various estimates and projections made by the partnerships with respect to the Terra-Drill program seemed reasonable. We find limited value in Mr. Golob's report and the conclusions reached by *690 him. In reaching his conclusions, Mr. Golob relied in large part on assumptions made by third parties. Mr. Golob lacked the technical background which would enable him to make an independent evaluation of the validity of these materials. Some of the key assumptions accepted by Mr. Golob, especially those dealing with the technological readiness of the Terra-Drill in 1980 and 1981, proved incorrect, which would seriously impair the validity of the conclusions reached by Mr. Golob. Moreover, his analysis and conclusions with respect to the projected cost savings resulting from the use of a Terra-Drill were significantly inflated in that they were based on the erroneous assumption that oil well drilling takes place only eight hours per day rather than 24 hours a day which is the normal practice in the industry. On this record, we place little reliance on the testimony and report of Mr. Golob. The dominant role played by Mr. Finesod and Mr. Haber in the formation of the six partnerships in 1980 and 1981 and in the almost identical structuring of each of the partnerships makes it unnecessary to examine separately the economic viability of the Terra-Drill activities purportedly undertaken *691 by each partnership. We can find very little indication that any of the partnerships had an actual and honest objective of earning a profit through their respective acquisitions for unrealistically inflated fees of a sublicense for the rights to a drill which, in effect, was little more than an untried concept. The absence of any real negotiations between the partnerships and Mitchell, the unquestioning acceptance without diligent inquiries of the preset terms of the sublicense agreements, and the glaring disparity between the amount paid by Mitchell for the Terra-Drill license and the heavy obligations incurred by the partnerships for the sublicense do not support a finding of a profit objective. See Helba v. Commissioner, 87 T.C. 983, 1005-1007 (1986). It also appears that the individuals purportedly in control of the partnerships' activities lacked the requisite experience or expertise in the area of oil and gas drilling systems. Samuel J. Simon, the initial general partner for GSLDA, RMDA, MCDA and MCDA II, was a certified public accountant by profession. Due to his lack of experience in this area, he was unable to determine whether the sublicense fees were *692 reasonable or reflective of acceptable business practices in the oil and gas drill technology industries. Nor does it appear that Leslie P. Lagoni, the initial general partner for FWDA and FWDA II had any training or background in oil and gas drilling technology. Consequently, no meaningful investigation into the economic merits of the sublicense agreement was attempted. Failure to make such elementary inquiries and to obtain expert advice in a transaction of this magnitude is not consistent with ordinary sound business practice and may be regarded as evidence that the partnerships lacked a profit objective. Herrick v. Commissioner, 85 T.C. 237, 256 (1985). We have considered the purported reliance placed by Mitchell on the reports prepared by MPI Marketing Research, Inc., and the Gelb Consulting Group late in 1980 in determining the sublicensing fees and the licensing districts to be covered by each sublicense. As far as we can determine, both entities were market research firms whose expertise and involvement in the oil and gas industry remains unclear. There is nothing in the record to attest to the experience of these market research firms in the field of *693 advanced oil and gas drilling technology. Moreover, an examination of these reports prepared late in 1980 indicates that due to the limited time available for their preparation, the firms simply collected existing information of drilling activity by area and then arranged the data to arrive at equal market potential by district. The record shows that the studies were based on misconceptions which greatly diminish the value of the conclusions drawn in the studies. For example, a basic misconception in the reports was an erroneous assumption as to the definition of hard-rock drilling as that term is understood in the oil and gas industry and drilling rates experienced in the industry. We note that a basic misconception permeating these reports is that the Terra-Drill is technologically feasible. Such basic misconceptions, since they are integral to the results reached in the reports, seriously diminish the worth of such reports. It is evident from the record that little time or effort was devoted by any of the partnerships to the exploration of the rights obtained to market the Terra-Drill under the sublicense agreements. A marketable Terra-Drill never existed. In view of the *694 pivotal role played by Mr. Finesod in the acquisition of the Terra-Drill license from Tround and in the formation of the partnerships to acquire sublicenses to market this technology, we think it is significant that Mitchell, which was controlled by Mr. Finesod, made no effort to assist Tround in the development of a working prototype of the Terra-Drill even though Mitchell could elect to do so under the November 11, 1980, license agreement with Tround. The inaction of the partnerships in the face of mounting evidence that the Terra-Drill development programs was showing negligible progress does not comport with a profit objective. The partnerships did little more than execute their respective sublicense agreements and incur onerous sublicense fee obligations to Mitchell. The mere acquisition by the partnerships of the right to market the drill is not, standing alone and in the context of this case, persuasive evidence of a profit objective. None of the general partners in the six partnerships here involved during the relevant period showed any success in similar fields. In fact, the general partners lacked any experience whatever in the area of oil and gas technology. Finally, *695 in view of the fact that a marketable Terra-Drill was never developed, the activities of the partnerships with respect to the actual marketing of the technology to third parties were negligible. We conclude that the six partnerships here involved did not engage in the Terra-Drill sublicensing activity in the years involved with an actual and honest objective of making a profit. We reach the same conclusion with respect to the oil and gas development drilling activities of the six partnerships during the years here at issue. Some of the considerations which point to a lack of profit objective apply with equal force here. Each of the six limited partnerships stated in its offering memorandum area promotional brochures that, in addition to the purported Terra-Drill program, it would engage in two other activities, a development drilling program and an exploratory drilling program. The exploratory drilling supposedly was to take place mainly in the so-called Overthrust Belt in Utah. As indicated earlier in this opinion, no exploration drilling was ever conducted by any of the partnerships in the Overthrust Belt. With respect to the development drilling program, each of the partnerships *696 represented that such drilling would take place in proven oil and gas areas: GSLDA in Ohio; RMDA in Ohio; FWDA in Ohio; FWDA II in Oklahoma and Tennessee; MCDA in Kansas and Oklahoma; and MCDA II in Tennessee and Oklahoma. The manner in which each of the partnerships embarked upon and carried on its respective development drilling activities indicates the absence of a bona-fide objective to make a profit, exclusive of tax savings. Each of the partnerships in its promotional materials and offering memorandum outlined drilling programs replete with the numbers of wells to be drilled in proven oil and gas areas with projections of net earning in impressive amounts over a period of years. Such drilling programs were to a large extent consistently abandoned. RMDA represented that it would drill 53 wells in the Berea Formation and four wells in the Medina Formation, both located in Ohio. The promotional brochure projected net revenue of $ 378,767,809 through 1996 based on 43,424 barrels of oil per Medina well and 9,522 barrels of oil and 119,800 MCF of gas per Berea well. Two Berea wells were drilled and subsequently shut in due to high water production and two other Berea wells *697 were plugged and abandoned. The partnership then abandoned its drilling activity in these areas. Available geological data and State survey maps indicated the production capabilities of wells drilled in this area. Mr. Hobbs concluded that the proposed Berea locations were in an area known to be water productive and that no oil and gas resource should have been attributed to the Berea formation. The results of the four or five wells drilled for RMDA in the Berea formation confirmed this. Moreover, the projected output of Medina wells was based upon data which was unrepresentative of the area as a whole. RMDA subsequently turned to drilling prospects outside the State of Ohio. Other partnerships also participated in these same prospects. Mr. Hobbs examined these prospects, including the Sacatosa Field Prospect in Texas, and the prospect in western Illinois. He concluded the Texas prospect was marginal and characterized by very low oil recovery and concomitant high operating costs. Mr. Hobbs considered oil production in western Illinois as highly erratic. He concluded that the interests acquired by RMDA in this area were very marginally productive. Mr. Hobbs reviewed all the *698 additional drilling prospects selected by RMDA after it abandoned the original prospects in Ohio and concluded that the properties were marginal prospects in depleted areas and that all the so-called developmental properties had very poor reserve potential. GSLDA represented that it would conduct a 42-well drilling program in southeastern Ohio, projected reserves of 16,800 barrels of oil per well over an 8-year period, and projected net revenues of $ 201,358,533 through 1995. The 42-well drilling program in southeastern Ohio was apparently abandoned after some four wells were drilled with unsatisfactory results. G. Warfield Hobbs, respondent's expert witness with respect to the partnership drilling activities, indicated that on the basis of geological data and the prior history of oil well drilling in the region, the cash flow projections and the estimated reserves for the purposed GSLDA wells were grossly misrepresented and highly inflated. Mr. Hobbs indicated that in this area of fairly marginal production the poor results realized by GSLDA could have been readily anticipated. GSLDA then turned to substitute properties and took partial interests in several States which included *699 prospects in western Illinois, the Sacatosa Field in Texas, and a number of interests in wells in Tennessee. GSLDA drilled wells in these prospects with varying results. Mr. Hobbs analyzed the underlying information and data with respect to each developmental project. Material was also obtained from State geological surveys. Each prospect was individually analyzed. It was concluded after a full and careful investigation that the majority of the projects in which GSLDA participated had poor production potential and had no chance of ever approximating the ratio or returns in investment which were promised in the offering memorandum. FWDA represented that it would drill 27 wells by December 31, 1983, in the same Berea and Medina formations in Ohio as RMDA. The same oil reserve figure used in the RMDA promotional material was also used with respect to FWDA. The FWDA promotional brochures projected net earning through 1996 in the amount of $ 165,201,580. FWDA did not engage in the drilling activities in Ohio as represented in the promotional material and in the private offering memorandum. It appears that FWDA subsequently acquired partial working interests in a number of wells *700 to be drilled by O'Neal Petroleum, Inc., in Ohio. FWDA also turned to drilling prospects outside the State of Ohio and participated in the acquisition of interests in western Illinois, the Sacatosa Field in Texas, and a prospect in Colorado. The opinion of Mr. Hobbs, respondent's expert witness, with respect to the marginal nature of the wells at the Sacatosa field in Texas and the prospects in western Illinois,is equally applicable here. Mr. Hobbs concluded that the majority of the prospects in which FWDA participated have poor production potential and had little chance of ever providing substantial profits on drilling dollars invested. He also concluded that the representations made by the partnership sales brochure regarding potential reserves and future cash flow were highly exaggerated and that the purported returns on drilling investment were inflated and unrealistic. FWDA II represented that it would allocate a maximum of $ 3,707,400 over a 3-year period to drill development wells on the Fort Payne-Mounteagle formations in Tennessee and in the Northeast Sparks prospect in Lincoln County, Oklahoma. The promotional brochure projected net revenues from the development drilling *701 program in the amount of $ 174,656,773. The Northeast Sparks Prospect in Oklahoma was never drilled. Mr. Hobbs examined the available geological information with respect to this area and concluded that the proposed partnership drilling was in a depleted zone and was basically worthless. Nor does it appear that the proposed drilling program in Tennessee was ever carried out by the partnership. The partnership substituted other prospects for drilling in Tennessee and also participated jointly with the other partnerships here involved in prospects in various states including the Sacatosa Field prospect in Texas and prospects in western Illinois. Mr. Hobbs concluded that the properties selected by FWDA II for its drilling activities, including the joint participation properties, were poor prospects and that the prospects, with their poor production potential, had little chance of generating the revenues proposed in the promotional materials. MCDA represented that it would acquire a 100 percent working interest in a 46-well development program in the New Albany Field area in Wilson County, Kansas. The partnership projected net earnings from the development program in the amount of *702 $ 173,372,910 through 1994. After drilling two dry wells, MCDA did not engage in any further drilling activity in Kansas. MCDA then acquired interests in other prospects in Texas, Oklahoma, Ohio, Arkansas and Tennessee. Many of these prospects, for example the Sacatosa Field in Texas, had participation by some of the partnerships herein involved. Mr. Hobbs analyzed the available data, including quarterly reports provided to the limited partners over this period, and concluded that the majority of the prospects in which MCDA participated had poor production potential. MCDA II represented that it would participate in developmental wells at a fixed cost on leases in Tennessee and in Lincoln County, Oklahoma. The partnership projected net earnings through 1995 from its developmental drilling program in the amount of $ 193,775,028. MCDA II never drilled wells in the prospect in Lincoln County, Oklahoma. Nor were any wells ever drilled by MCDA II in the Tennessee prospect as designated in the promotional materials. MCDA II substituted partial working interests in other prospects in Oklahoma, Tennessee, Texas, Arkansas, Ohio, and Kansas. A principal substitute property was in the *703 Sacatosa Field in Texas. Mr. Hobbs examined the relevant reports and geological data and concluded that the majority of the prospects in which MCDA II participated had poor production potential. Dr. Jaromir Ledecky is an economist with over 20 years experience in strategic planning and economic forecasting. His background includes oil company financial analysis experience including oil demand and price forecasting. From 1980 to 1982 he served as Director of U.S. Economic Analysis at CONOCO, Inc. Dr. Ledecky, as respondent's expert witness, prepared the portion of the expert witnesses' combined report pertaining to oil and gas price forecasts used by the six partnerships in their productional materials. In making his evaluation of such oil and gas price forecasts, Dr. Ledecky considered, inter alia, the economic conditions prevailing in the oil and gas industry during the period 1978 to 1982, oil and gas price forecasting methodologies, price forecasts made by the United States Department of Energy, and price forecasts used by petroleum engineering firms within the oil industry. Each of the six partnerships made projections of its expected revenues from its oil and gas drilling *704 operations. Future revenues were based on reserve volumes produced each year and the price received for oil and gas sold each year. In making the revenue projections, the partnerships escalated prices at a rate 11 percent from the initial year of production to the final year of production. The reason for the 11 percent escalation rate is unexplained. The maximum price per barrel of oil used in their revenue projections by the partnerships was as follows: Maximum Oil
Partnership
Terminal Year
Price Per Barrel
GSLDA
1995
$ 153.08
RMDA
1996
169.92
FWDA
1996
169.92
FWDA II
1995
141.95
MCDA
1994
137.91
MCDA II
1995
141.95
Dr. Ledecky testified that the oil and gas prices used to project the future revenues of the partnerships were based on a methodology called "naive forecasting" which assumes that conditions which prevailed in the past will continue to prevail indefinitely in the future. Dr. Ledecky stated that the naive forecast methodology does not take into effect future trend changes or reversals and he indicated that the method was particularly inappropriate for forecasting long-term oil *705 and gas prices because of the historical sharp price changes and trends. He testified that the results of naive forecasting depended on the selection of a particular trend. Dr. Ledecky indicated that the partnerships, in making their revenue projections on the basis of the trend of oil prices during the short 1979 - 1981 period which Dr. Ledecky regarded as a brief period of maximum price escalations, produced a series of revenue projections that were unrealistically high. In effect, a cyclical price movement was extended by the partnerships into a trend covering the decade of the 1980's and half of the 1990's decade. He indicated that in view of the weak demand for oil and gas in 1980 and 1981, coupled with a sharp increase in supply, the use of the naive forecasting method based on the oil price of this brief period and the use of a constant 11 percent escalation factor did not yield reasonable results. It was concluded in the expert witness report that the oil price forecasts made by the partnerships were unreasonable and not consistent with practices within the petroleum industry. In short, the record underscores a propensity on the part of each of the partnerships to select *706 or acquiesce in drilling prospects that were only marginally productive, both with respect to the properties designated in the original drilling programs and in the substituted properties. In view of the drilling data and geological information readily available to the industry in 1980, the uniformly unsuccessful results encountered by the partnerships in their original drilling programs were fairly predictable. We regard this seeming indifference to available information in conducting the partnership activities as evidence of the lack of a bona-fide profit objective in embarking upon these activities. Moreover, the projected revenues from the drilling program were based upon oil and gas reserves in the various prospects that were demonstrably unrepresentative of the past drilling histories in the prospects involved. Finally, the projected ratio of partnership returns to the cash budgeted by the partnerships for the development drilling programs was far beyond the normal returns historically experienced in the oil and gas industry. For example, the projected returns on investment in development drilling, assuming that all units in the partnerships were sold to investors, ranged *707 from about 40-to-1 to a peak in excess of 80-to-1. In view of the evidence in the record which clearly shows that, in general, the ratio of returns to cash investments in this particular industry investments of considerably less than 10-to-1 are regarded as reasonable and within industry expectations, the portrayal of the contrived ratios in the promotional materials highlights the illusory nature and absence of economic substance in the development drilling activities of the partnerships. Neither Mr. Simon, the individual general partner of four partnerships, nor Mr. Lagoni, the individual general partner of the remaining two partnerships, had any significant experience or background in the development drilling reports of the oil and gas industry. The corporate general managers of the partnerships were actually engaged by the partnerships as drilling contractors whose compensation was in large part geared to the number of wells drilled rather than to the success of the wells. Since most of the original prospects designated by the partnerships for their development drilling programs were abandoned, it would not appear that the purported expertise of the corporate general partners *708 could be considered an aid to the selection of promising properties with potentials for profit. While the corporate general partners did in some instances drill producing wells, there is scant evidence in the record to establish the profitability of the results achieved by the partnerships under the development drilling programs conducted in the substitute prospects. Respondent's expert witness concluded that, in view of the scope of the actual investment by the partnerships in their respective drilling programs and the poor production potentials of the prospects selected, it was unlikely that the drilling activities of the partnerships would ever generate sufficient revenues to net the overall obligations of the partnerships or generate profits on the investments made in the partnerships. We must conclude on the basis of the entire record that none of the partnerships here involved entered into the development drilling activities with an actual and honest objective of making a profit. An examination of the activities of each partnership in its totality buttresses our conclusion with respect to the absence of a bona-fide profit objective. The huge disparity between the cost to *709 Mitchell of $ 1,600,000 to acquire the Terra-Drill license from Tround in 1980 followed by the willingness of the partnerships unquestioningly to incur obligations of approximately $ 225,000,000 for territorial sublicenses for an untried technology does not indicate a profit-motivated concern. Moreover, in view of the complete absence of any workable Terra-Drill which would enable the partnerships to generate revenues to meet their heavy obligations, the abandonment of the exploratory drilling program, the gradual abandonment of the prospects designated by the partnerships for their original development drilling programs and the stark unreality of the revenue projections from the drilling activities which were based upon untenable assumptions all reinforce a conclusion that the partnerships were indifferent to the success of the venture as a business proposition. The tax advantages offered by each of the six partnerships were prominently featured in the respective offering memoranda. For example, the offering memorandum of GSLDA set forth the anticipated tax losses to be incurred by each limited partner per unit of investment during the first three years as follows: Cash
Estimated
Loss as a Percent
Year
Investment
Tax Loss
of Cash Invested
1980
$ 12,500
($ 50,000)
400 percent
1981
12,500
(  50,000)
400 percent
1982
12,500
(  50,000)
400 percent
*710 The identical 4-to-1 tax advantage was featured in the offering memoranda for RMDA, FWDA II and MCDA II; a 3-1/2-to-1 tax advantage was offered by FWDA; and a 3-to-1 tax advantage was offered by MCDA. We are convinced that the concern of each of the six partnerships was to create the heralded tax advantages. We hold that the activities of each of the six partnerships here involved were not engaged with an actual and honest objective of making a profit within the meaning of section 183. The partnerships, therefore, are not entitled to the deductions claimed by them in the years here at issue except as otherwise allowed by section 183(b) and, accordingly, petitioners herein are not entitled to deductions for the distributive losses claimed by them in the years at issue. Our conclusion with respect to the absence of a profit objective is dispositive of the cases before us. Because the partnerships' transactions were devoid of any profit objective, as we have concluded, and lacked economic substance, the deductions claimed by the accrual basis partnerships for interest on the note obligations pursuant to section 163(a) to Mitchell, which had no practical economic effect other than *711 the creation of tax losses, must also be disallowed. Friendship Dairies, Inc. v. Commissioner, 90 T.C. 1054, 1067-1068 (1988).We are persuaded on this record that the note obligations did not reflect a genuine indebtedness from the partnerships to Mitchell. It is settled law that in order for an interest deduction to be allowable, the indebtedness must be genuine. Herrick v. Commissioner, 85 T.C. 237, 260 (1985). With respect to the Terra-Drill programs of the partnerships, respondent makes an alternative argument that the deductions claimed for the sublicense fees should be disallowed for failure to meet the requirements for deductibility pursuant to section 1253(d)(2). The partnerships considered their sublicenses to be franchises and claimed annual deductions for their respective sublicense fees pursuant to section 1253(d)(2). Section 1253(d)(2) allows a deduction for payments (other than contingent payments within the meaning of section 1253(d)(1)) made by transferees of a franchise. In Herrick v. Commissioner, supra at 266, we concluded that in order for such amounts to be deductible under section 1253(d)(2), "the taxpayer *712 must be operating or conducting a trade or business after the payments are made." We further stated that "The mere signing of an agreement for the transfer of a franchise or distributorship, and payment of the acquisition or initial fees, do not, ipso facto, entitle the taxpayer to a deduction." Herrick v. Commissioner, supra at 266.In Jackson v. Commissioner, 86 T.C. 492 (1986), affd. 864 F.2d 1521 (10th Cir. 1989), we again held that the trade or business requirement was a prerequisite to any deduction under section 1253(d)(2) and emphasized that merely acquiring a license to distribute a product within a territory does not place the taxpayer in the trade or business of distributing that product. Here, we have concluded that none of the partnerships engaged in any meaningful activity with respect to the Terra-Drill sublicense. In fact, the record clearly establishes that a working Terra-Drill did not even exist during the years at issue. Moreover, it appears that a working Terra-Drill still has never been developed. Finally, the record establishes the complete absence of a profit objective on the part of the six partnerships in *713 their acquisition of their respective territorial sublicenses to market the nonexistent Terra-Drill. We conclude on this record that the partnerships were not in a trade or business with respect to the Terra-Drill program during the year at issue and therefore are not entitled to the claimed deductions in connection with the sublicense fees under the provisions of section 1253(d)(2). Respondent in the notice of deficiency determined additions to tax under section 6653(a)(1) and (2) in the cases pertaining to petitioner Nicholas L. Arky and petitioners Lester H. Strickler and E. Grace Strickler. Petitioners have the burden of proof in these cases. Bixby v. Commissioner,58 T.C. 757, 791-792 (1972).Respondent also claimed additions to tax under sections 6653(a) and 6653(a)(1) and (2) by amended answer in the remaining cases as indicated above. Respondent has the burden of proof where the issues were raised by amended answer. See Rule 142(a). Sections 6653(a) and 6653(a)(1) impose an addition to tax if any part of an underpayment is due to negligence or disregard of rules and regulations. Section 6653(a)(2) imposes an addition to tax in the amount of 50 percent *714 of the interest due on the portion of the underpayment attributable to negligence. Negligence is defined as the lack of due care or failure to do what a reasonable and prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 937 (1985). The general rule is that the duty to file accurate returns cannot be avoided by placing responsibility on an agent. Pritchett v. Commissioner, 63 T.C. 149, 174 (1974).An exception to this rule may exist where the taxpayer, in preparing his return, relied on the advice of a competent tax adviser. See, e.g., Industrial Valley Bank & Trust Co. v. Commissioner, 66 T.C. 272, 283 (1976); Woodbury v. Commissioner, 49 T.C. 180 (1967).However, reliance on professional advice does not, by itself, constitute an absolute defense to negligence but, rather, it is a factor to be considered. Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990).The taxpayer's reliance must be in good faith and demonstrably reasonable. Ewing v. Commissioner, 91 T.C. 396, 423 (1988); Freytag v. Commissioner, supra at 888-889. *715 Petitioner Nicholas L. Arky and petitioners Lester H. Strickler and E. Grace Strickler did not testify at the trial of this consolidated group of cases. Petitioners in these two cases have the burden of proof. Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972).Mr. Arky acquired his interest in MCDA II in 1981. He made a cash down payment of $ 10,000 and executed two negotiable promissory notes due March 1, 1982, and March 1, 1983, respectively, each in the amount of $ 10,000. He also arranged an open account obligation payable to MCDA II in the amount of $ 120,000 payable in 1994. He claimed losses on his 1981 and 1982 Federal income tax returns in the respective amounts of $ 39,600 and $ 42,967 with respect to his investment in MCDA II. Mr. Strickler acquired his interest in FWDA II in 1981. He too made a cash down payment of $ 10,000 and executed two promissory notes due March 1, 1982, and March 1, 1983, respectively, each in the amount of $ 10,000. He also arranged an open account obligation to FWDA II in the amount of $ 120,000 payable in 1994. He claimed losses on his 1981 and 1982 tax returns in the respective amounts of $ 39,600 and $ 42,200 with *716 respect to his investment in FWDA II. We have examined the nature of the proposed activities of MCDA II and FWDA II and we have concluded that neither of these partnerships engaged in profit oriented activities in the period involved. As stated above, none of the petitioners testified as to the circumstances surrounding their respective investments. Accordingly, in the absence of any persuasive evidence from said petitioners with respect to the negligence issue, we must sustain respondent. Nor was there any testimony with respect to petitioners in docket No. 47752-86 (Estate of Aaron Bassin, Deceased, Ruth Bassin, Personal Representative, and Ruth Bassin). Mr. Bassin (now deceased) acquired an interest in MCDA in 1981. He made a cash down payment of $ 12,500 and executed three promissory notes due March 1, 1982, 1983 and 1984, respectively, each in the amount of $ 12,500. He also executed a nonnegotiable promissory note in the amount of $ 100,000 due January 15, 1994. On his 1981 Federal income tax return he claimed a loss of $ 37,104 with respect to his investment in MCDA. Respondent introduced evidence and expert witness testimony to establish the lack of any feasible profit *717 potential in the proposed activities of MCDA as well as the remaining partnerships. We concluded on the basis of the record that the activities of MCDA were not engaged in for profit. The record also establishes that the lack of a bona-fide profit objective on the part of the partnership was evident at the very outset. The absence of economic reality in the partnership programs could, we believe, have been readily discovered with the exercise of a modicum of due care. On this record, we must sustain respondent's determination of negligence for the taxable year 1981. Petitioner Rosco C. Webb, Jr., who has been a surgeon since the late 1950's, acquired his interest in FWDA in 1981. He testified that he learned about FWDA from his accountant and that he relied on his accountant in making the investment in FWDA. Dr. Webb made no effort to investigate the feasibility of his investment in FWDA and did not know whether his accountant had done so. Dr. Webb could recall little about his investment. He knew nothing about the Terra-Drill technology and had little or no knowledge of the partnership activities. Dr. Webb was unaware of any open account obligations to FWDA in the amount *718 of $ 225,000 due in 1994. We do not believe that Dr. Webb, in view of his scant knowledge about the nature of his investment in FWDA, showed due care in failing to apprise himself of the economic merits of the proposed partnership program. We are not convinced that his perfunctory reliance on his accountant is tantamount to obtaining and relying upon expert advice. Under the circumstances, we do not believe that Dr. Webb's reliance on his accountant relieves him of his duty to file accurate returns. We conclude that petitioner Webb in this case was negligent. Petitioner Fred J. Sherman is in the export trading business and is president and principal owner of Searock Trading Corporation. He acquired his interest in GSLDA in 1980 upon the recommendation of his accountant. Mr. Sherman testified that he could not recall seeing the GSLDA promotional material and further testified that he made no independent analysis of the value of his investment. Prior to 1980 he had not heard about the Terra-Drill and he knew that no drill had been developed at the time of his investment in GSLDA. Mr. Sherman also testified that he did not know about the subsequent progress made in the development *719 of the Terra-Drill. Mr. Sherman, an experienced businessman, acquired his interest in GSLDA without any independent analysis of the venture. His reliance on his accountant, whose expertise in this area is not evident, does not automatically absolve Mr. Sherman of negligence. Mr. Sherman acquired his interest in the partnership even though he knew the Terra-Drill, which was the centerpiece of the partnership endeavors, had not yet been developed. His initial lack of concern in the economic validity of the partnership enterprise as a whole is buttressed by his apparent indifference to the rate of progress, or lack of such progress, in the subsequent development of the Terra-Drill. If there had been a bona fide examination of the partnership programs, it is unlikely that any reasonable person would have expected such programs to work. See Hanson v. Commissioner, 696 F.2d 1232, 1234 (9th Cir. 1983), affg. a Memorandum Opinion of this Court. On this record, we conclude with respect to petitioner Sherman that the addition to tax for negligence for the year involved must be sustained. Petitioner Quaiser Bakht has been a physician since 1955. Dr. Bakht acquired his *720 interest in GSLDA in 1980. He learned about GSLDA from an individual who regularly came to petitioner's hospital to sell a variety of investments. Dr. Bakht testified that his accountant saw the proposal and purportedly advised him that it was risky but made sense in the long run. Dr. Bakht did not know about the Terra-Drill prior to 1980, and he mistakenly thought that GSLDA was not limited to marketing the drill to a specific territory but, rather, could market it worldwide. Dr. Bakht testified that he has never seen the drill and does not know whether or not it was in existence. He did not know where GSLDA proposed to conduct the exploratory drilling programs. Nor did he make any effort independently to obtain engineering or geology reports with respect to the feasibility of the exploratory drilling program. Dr. Bakht was not familiar with the development drilling program proposed by GSLDA, and he apparently did not read the offering memorandum concerning such programs. There is no indication that Dr. Bakht's accountant had the requisite market experience with respect to advanced drilling technology or the oil and gas industry upon which to base an opinion that Dr. Bakht *721 reasonably and in good faith could rely upon. He apparently acquired his interest in GSLDA with little or no understanding of the nature of the proposed partnership programs. On this record, we conclude that petitioner Bakht is liable for the additions to tax for negligence for the year involved within the meaning of the statute. Petitioner Michael Sirkus has a bachelor of arts degree from New York University and during the period here involved he was in the wholesale seafood business. Mr. Sirkus acquired his interest in RMDA in 1980 after learning about it from his accountant. Mr. Sirkus did not know about the Terra-Drill prior to 1980. He was not aware of any design problems concerning the Terra-Drill in 1980, he did not know that RMDA sublicensed the right to use and market the drill, and he could not recall the derivation or cause of the partnership losses in the first three years of its existence. Mr. Sirkus did not know what was involved in the proposed exploration drilling program of RMDA. Nor was he familiar with the GSLDA development drilling program. Mr. Sirkus made no independent effort to determine the feasibility of the various activities proposed by the partnership *722 in which he invested. There is no showing that the accountant who told Mr. Sirkus about the RMDA venture had the requisite expertise to gauge the economic feasibility of the various programs proposed by RMDA. Mr. Sirkus' ready acquisition of an interest in RMDA notwithstanding his apparent lack of familiarity with the basic essentials of the RMDA venture and the absence of any efforts to investigate the bona fides of the program is not consistent with the actions of a reasonable and prudent investor. We must therefore conclude on this record that petitioner Sirkus in this case was negligent and hence liable for the additions to tax for negligence in the taxable year involved. Petitioner William R. Parient, Jr., is a certified public accountant. At the time he acquired his interest in RMDA he was vice president and treasurer of a worldwide distributor of various products for the cable television industry. Mr. Parient acquired his interest in RMDA in 1980. He learned about RMDA through Worldco, a marketing entity for the RMDA program. Mr. Parient did not investigate the financial status of RMDA when he made his investment and he was unaware of its assets or liabilities. He had *723 not heard about the Terra-Drill prior to 1980. Although he indicated that he was mostly interested in the potential of the Terra-Drill, rather than the exploration and development drilling program of RMDA, he could not recall whether a prototype of the drill ever existed in 1980. In fact, he could not recall what the partnership planned to do about the Terra-Drill in 1980. He did not know the status of the long-term notes that he executed when he acquired his interest in RMDA. He also testified that he might consider legal action to contest any efforts to collect on the long-term obligations when they came due some time in the late 1990's. In view of Mr. Parient's professional and business background, we find his actions in acquiring his RMDA interest without the normal prudent inquiries to be unreasonable. He obviously did not display the expected prudent concern about the economic viability of his investment. On this record, we must conclude that petitioner Parient in this case was negligent and therefore liable for the additions to tax for negligence in the taxable year involved. Petitioner George Tsakonas is a medical doctor. Dr. Tsakonas acquired his interest in FWDA *724 in 1981 after he learned about the partnership from materials he received in the mail. He testified that he discussed the investment with his tax return preparer. Dr. Tsakonas had no prior experience in the areas of drill bit technology or oil and gas. He was not familiar with the sublicense fee arrangement under which FWDA acquired its rights to the Terra-Drill technology. When Dr. Tsakonas acquired his interest in FWDA in 1981 he was unaware of the stage of development of the Terra-Drill. He did not know the amount paid by FWDA to acquire its sublicense. Finally, Dr. Tsakonas testified that he was not aware of the difference between the exploratory drilling and the development drilling programs proposed by FWDA. Dr. Tsakonas' efforts to analyze the economic worth of his investment were practically nonexistent. His evident lack of concern about the bona fides of the partnership programs does not reflect the actions of a prudent and reasonable investor. On this record we find that petitioner Tsakonas in this case was negligent and therefore liable for the additions to tax for negligence in the taxable year involved. Petitioner Eugene Pitts is a medical doctor, now retired. *725 Dr. Pitts acquired his interest in FWDA II in 1982 but could not recall how he heard about the partnership. He has no background in oil and gas or in advanced tool technology. Dr. Pitts testified that he very vaguely knew what a drill bit was. He was not familiar with the structure of the partnership or with any of its proposed activities. Nor did he know if a Terra-Drill was in existence when he acquired his interest in FWDA II in 1982. There is no indication that he made any effort to investigate the nature of his investment. Finally, Dr. Pitts testified that he had no recollection about his long-term obligation to the partnership originally due in 1993 and subsequently extended to 1998. On this record we do not believe that Dr. Pitts' actions in perfunctorily embarking on this partnership venture comported with those of a prudent and reasonable person. We conclude that petitioner Pitts in this case was negligent and hence liable for the additions to tax for negligence in the taxable year involved. Petitioner Frank Dietrich described his occupation as a business manager dealing with maintenance repair and upkeep. He acquired his interest in MCDA in 1981 through his wholly *726 owned small business corporation, SETO, Inc., Mr. Dietrich was not sure about the nature of the corporation's business activities other than the acquisition of the MCDA interest. Petitioner learned about MCDA from one Ron Gould. Petitioner stated that Mr. Gould was "some kind of a broker, I guess." Mr. Dietrich testified that he skimmed through the MCDA promotional material. He did not know whether a prototype of the Terra-Drill existed in 1981. Nor did he know of any existing technical problems with respect to the drill in 1981. He did not know where the Overthrust Belt was located and he did not know whether MCDA ever conducted any drilling operations there. Mr. Dietrich did not know the amount paid by MCDA to acquire its rights under the sublicense. Finally, Mr. Dietrich made no effort to obtain an independent evaluation and analysis of the explanation and development drilling programs. We do not believe that the stark indifference displayed by Mr. Dietrich to the bona fides and to the economic validity of the partnership venture comports with the actions of a prudent and reasonable investor. On this record, we conclude that petitioner Dietrich in this case was negligent *727 and therefore liable for the additions to tax for negligence for the taxable year involved. Petitioner Herman David has been in the diamond business since the late 1940's. He could not recall anything about MCDA II. Mr. David who claimed a loss of $ 64,451 on his 1982 return with respect to the MCDA II investment, testified that his sons made his investments. Mr. David's son, Sheldon, also testified. Mr. Sheldon David has an M.A. in business administration and, together with his brother, has been in full control of his father's business for some ten years. Mr. Sheldon David has no experience in drill bit technology or in the area of oil and gas. He learned about MCDA II through his accountant. Mr. Sheldon David could not recall seeing the promotional materials for MCDA II. When he acquired the interest in MCDA II, Mr. Sheldon David was not aware of the significant problems in developing the Terra-Drill technology. Nor could he specifically recall all of the proposed activities of the partnership. He was not aware of the Overthrust Belt where the proposed exploratory drilling was to be conducted by the partnership. Nor did he have any personal knowledge of the development drilling *728 program. Mr. Sheldon David was unaware of the amount paid by MCDA II to acquire the Terra-Drill sublicense and could not recall the exclusive territory where the partnership proposed to market the technology under the sublicense. Mr. Herman David frankly admitted that he relied completely upon his children for investments. However, the record does not establish that Mr. Sheldon David or his accountant possessed the requisite expertise to provide advice in respect to the bona fides of the financial aspects of the transaction here at issue. Consequently, Mr. Herman David cannot avoid the additions to tax for negligence on the ground that in making this investment, he relied in good faith on professional advice. We must conclude on this record that petitioner David in this case was negligent and, therefore, liable for the additions to tax for negligence for the taxable year involved. We so hold. The next issue is whether certain of the petitioners herein involved are subject to the addition to tax pursuant to section 6661. Respondent states on brief that section 6661 is at issue only in the cases involving petitioners Michael Sirkus, Lester H. Strickler, Eugene Pitts, and Herman *729 David. With respect to returns filed after December 31, 1982, section 6661(a) imposes an addition to tax equal to 25 percent of any underpayment attributable to a substantial understatement of income tax. Pallottini v. Commissioner, 90 T.C. 498 (1988).An understatement of tax is substantial if it exceeds the greater of 10 percent of the amount required to be shown on the return for the taxable year or $ 5,000. Sec. 6661(b)(1). An understatement is the amount by which the amount required to be shown on the return exceeds the amount actually shown on the return. Sec. 6661(b)(2). Each of the cases mentioned above meets this threshold requirement. If a taxpayer has substantial authority for the tax treatment of an item on his return, the understatement is reduced by the amount attributable to such item. Sec. 6661(b)(2)(B)(i). Furthermore, if a taxpayer adequately discloses on his return the relevant facts pertaining to any tax item, the amount of the understatement is reduced by the amount of such item. Sec. 6661(b)(2)(B)(ii). However, if the tax item is attributable to a tax shelter, the amount of the understatement may only be reduced where there is substantial *730 authority for the taxpayer's position and in addition the taxpayer reasonably believed his tax treatment of the item was more likely than not the proper tax treatment. Sec. 6661(b)(2)(C)(i). A tax shelter is defined as a partnership, entity, investment plan, or other plan or arrangement whose principal purpose is the avoidance or evasion of Federal income tax. Sec. 6661(b)(2)(C)(ii). We believe that the partnerships in which the above-referenced petitioners acquired interests were clearly tax shelters as defined by the statute. We are satisfied that the principal purpose of the partnerships in question was the avoidance of Federal income tax. Our finding that the proposed programs of the partnerships were not profit-motivated and lacked economic substance reinforces this conclusion. We need not repeat our analysis above which underscored these findings. Since profit was not one of the partnerships' possible outcomes, which is evident from the complete absence of any economic feasibility in the proposed partnership activities and the sheer impossibility of generating income to meet the grossly inflated obligations of the entity, and where the promised tax benefits are substantial, *731 we find that partnerships' principal purpose was tax avoidance. We do not believe that any of the above-referenced petitioners reasonably believed that the claimed tax treatment was "more likely than not" the proper treatment. Sec. 6661(b)(2)(C)(i). From the testimony of said petitioners it is abundantly clear that they did not make the kind of independent legal or factual analysis of the relevant partnership programs which would enable them to formulate any reasonable belief one way or another as to whether the tax treatment given to the claimed deduction was more likely than not the proper tax treatment. Indeed, the general approach of the petitioners to the economic aspects of their investments in their respective partnerships, as contrasted to the tax benefits involved, was one of studied indifference. See Ferrell v. Commissioner, 90 T.C. 1154, 1205-1206 (1988).We hold that the addition to tax under section 6661 is applicable with respect to the above-referenced petitioners in the taxable years involved. The next issue we must decide is whether petitioners are liable for the increased rate of interest pursuant to section 6621(c). The increased rate of *732 interest is 120 percent of the statutory rate for substantial underpayment (defined as underpayments of at least $ 1,000) attributable to tax motivated transactions. Sec. 6621(c)(1). Deductions disallowed for any period under section 183 relating to an activity not engaged in for profit are included as tax motivated transactions in the temporary regulations. Sec. 301.6621-2T, Q-4 and A-4, Temporary Proced. & Admin. Regs., 49 Fed. Reg. 50391 (Dec. 28, 1984). See Patin v. Commissioner, 88 T.C. 1086 (1987), affd. without opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion Patin v. Commissioner, 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989).We have previously found that the activities engaged in by the partnerships were activities not engaged in for profit under section 183. Underpayments resulting from the disallowance of deductions under section 183 are, therefore, subject to section 6621(c). Accordingly, we *733 hold that the increased rate of interest under section 6621(c) applies to the underpayments involved in these cases. The next issue we must decide is whether petitioners are liable for damages pursuant to section 6673. Section 6673 authorizes this Court to award damages (now called a penalty) to the United States whenever it appears that a taxpayer instituted or maintained a proceeding before this Court primarily for delay, that the taxpayer's position in such proceeding is frivolous or groundless, or, with respect to proceedings commenced after October 22, 1986, that the taxpayer unreasonably failed to pursue available administrative remedies. Here the parties presented the reports and testimony of expert witnesses with respect to the economic feasibility of the activities of the six partnerships here involved and the parties presented testimony and evidence bearing upon the applicability of section 183 to the transactions at issue. Our resolution of the main issues before the Court turned upon the factual determination under section 183. The economic validity and the bona fides of both the Terra-Drill sublicensing activities and the oil and gas development drilling programs *734 of the partnerships were at issue. The record is voluminous. We are reluctant to conclude that petitioners did not undertake to litigate the factual merits of these partnership programs in good faith. Consequently, and in the exercise of our discretion, we decline to require petitioners to pay a penalty under section 6673. Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: Frank Dietrich, docket No. 36291-85; Nicholas L. Arky, docket No. 18029-86; Herman David and Sylvia David, docket No. 25683-86; Lester H. Strickler and E. Grace Strickler, docket No. 27578-86; George Tsakonas and Ernestine Tsakonas, docket No. 40464-86; Fred J. Sherman and Leonora Sherman, docket No. 43921-86; Michael Sirkus, docket No. 46308-86; Estate of Aaron Bassin, Deceased, Ruth Bassin, Personal Representative, and Ruth Bassin, docket No. 47752-86; William R. Parient, Jr. and Jane M. Parient, docket No. 48498-86; Eugene and Leora Pitts, docket No. 14440-87; and Quaiser Bakht and Cresanta Bakht, docket No. 15064-87.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. 50 percent of the interest due on the underpayment of $ 24,394.00 attributable to negligence. ↩
**. 50 percent of the interest due on the underpayment of $ 12,881.00 attributable to negligence.↩
*. 50 percent of the interest due on the underpayment of $ 20,010.08 attributable to negligence.↩
**. 50 percent of the interest due on the underpayment of $ 20,985.000 attributable to negligence.↩